# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| ELI ELOY ESCOBAR and | § | |
| LYDIA ESCOBAR, individually | § | |
| and as heirs of and representatives | § | |
| of the estate of ELI ELOY | § | |
| ESCOBAR JR., | § | |
| | § | |
| Plaintiffs, | § | CIVIL ACTION NO. 04-1945 |
| | § | |
| v. | § | |
| | § | |
| CITY OF HOUSTON and | § | |
| ARTHUR J. CARBONNEAU, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND OPINION

On November 21, 2003, Houston Police Department Officer Arthur J. Carbonneau and a fourteen-year old boy, Eli Eloy Escobar, Jr., struggled. Carbonneau's gun discharged, striking Escobar in the head and killing him. Escobar's parents brought this wrongful death and survival action against Officer Carbonneau and the City of Houston ("the City"), alleging constitutional violations under 42 U.S.C. § 1983 and state-law causes of action for excessive force, unlawful detention and seizure, and negligence. The City has moved for summary judgment on all claims. (Docket Entry No. 82). The plaintiffs have responded, (Docket Entry No. 95), the City has replied, (Docket Entry No. 100), the plaintiffs have surreplied, (Docket Entry No. 127), the City has responded to the surreply, (Docket Entry No. 130), the plaintiffs have replied, (Docket Entry No. 134), and the City has responded, (Docket Entry No. 135). The City has also moved to exclude the plaintiffs' expert witnesses, (Docket Entry

Nos. 80, 81), and the plaintiffs have responded, (Docket Entry Nos. 96, 99). The summary judgment motion and response raise the issue of municipal liability; qualified immunity is not raised or addressed.

Based on the record; the motions, responses, and replies; the parties' submissions; and the applicable law, this court grants in part and denies in part the City's summary judgment motion, denies the City's motion to exclude the testimony of one of the experts, David Klinger, and denies as moot the City's motion to exclude the testimony of another expert, Stewart Ater. The reasons are set out below.[1]

## I.    Background

---

[1] Three additional motions are pending. Officer Carbonneau has moved for a separate trial. (Docket Entry No. 79). The City has responded. (Docket Entry No. 90). The record is unclear as to the status of the plaintiffs' claims against Carbonneau. Carbonneau states that the plaintiffs have dismissed their claims against him; however, the plaintiffs' second amended complaint seeks damages from Carbonneau and the City "jointly and severally," (Docket Entry No. 119 at 5), and the City seeks contribution from Carbonneau in the event it is held liable. The issue of the officer's qualified immunity is not before the court.

Rule 42(b) provides:

> The court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any claim, cross-claim, counterclaim, or third- party claim, or of any separate issue or of any number of claims, cross-claims, counterclaims, third-party claims, or issues, always preserving inviolate the right of trial by jury as declared by the Seventh Amendment to the Constitution or as given by a statute of the United States.

FED. R. CIV. P. 42(b). Given the present posture of this case, the motion for separate trials is denied.

The plaintiffs have moved to supplement the summary judgment record by submitting Exhibit 48, correspondence from an HPD sergeant to HPD's police chief. (Docket Entry No. 101). The motion is unopposed and is granted. The court notes that the plaintiffs have submitted two exhibits numbered 48. For clarity, the court will refer to the exhibit attached to Docket Entry No. 101 as "Docket Entry No. 101, Exhibit 48A". The plaintiffs' other Exhibit 48, Carbonneau's field training record, is referred to as "Docket Entry No. 127, Ex. 48B."

The plaintiffs have requested oral argument on the summary judgment motion. (Docket Entry No. 104). The City is opposed, arguing that oral argument is unnecessary given the extensive record. (Docket Entry No. 112). This court agrees. Both sides have thoroughly briefed the court on the issues and their arguments. The motion is denied.

On November 21, 2003, Houston Police Department (HPD) Officers Arthur J. Carbonneau and his partner, Ronald Olivo, responded to an "assault–no injury" call at the Silver Creek apartment complex in Houston, Texas.  Ten-year old Matthew Rodriguez reported that he had been punched in the face by a fourteen- or fifteen-year old boy named "Oscar."  (Docket Entry No. 95, Ex. 1 at 88:2–89:9).  Rodriguez also told the officers that "Oscar" had also broken a window at the Rodriguez family apartment.  (*Id.* at 90:20–91:16). Rodriguez told the officers that "Oscar" was a Hispanic male of "average size."  (*Id.* at 89:10–23).

The officers learned that Oscar lived at the nearby Burnham Woods apartment complex.  The officers, accompanied by Rodriguez, one of his friends, and the boys' fathers, went to the Burnham Woods complex to look for Oscar.  Rodriguez's friend identified the apartment where he believed Oscar lived.  When the officers knocked on the door, three boys answered.  (*Id.* at 98:1–14).  The officers asked the three to step out of the apartment and onto an enclosed patio to answer questions about Oscar.  The boys, later identified as Jose Sanchez, Jose Salmeron, and Eli Eloy Escobar, Jr., had been playing video games when the officers knocked on the door.  The boys complied with the officers' request and came outside.  The boys told the officers their names and stated that they did not know where Oscar was.  (*Id.* at 99:1–101:5).

It was later determined that the suspect, Oscar Sanchez, was Jose Sanchez's older brother.  The Sanchez family lived in the apartment where Jose Sanchez, Jose Salmeron, and Eli Escobar were playing video games.  Both officers stated that they had no reason to

3

believe that Escobar was the Oscar they sought.  Among other things, Escobar weighed two hundred and seventeen pounds and was not of "average" size, as Oscar had been described. (*Id.* at 98:15–101:2; Docket Entry No. 95, Ex. 6 at 100:16–101:9).

Officer Olivo stated that as the three boys came out of the apartment, the apartment door closed behind them "as if somebody is like standing behind the door and like closed it or something."  Olivo asked Carbonneau to go into the apartment to see if anyone was inside. (Docket Entry No. 95, Ex. 1 at 103:11–19).  After questioning the three boys and determining that none of them was Oscar, Officer Carbonneau drew his service revolver and went into the apartment to ensure that it was "safe and clear" and to look for "Oscar or anyone hiding or sitting around that didn't want to cooperate."  (Docket Entry No. 95, Ex. 6 at 102:8–107:5; *id*. at 106:22–107:5).  Jose Salmeron, one of the three boys questioned by the officers, testified that Officer Carbonneau did not ask anyone whether he could go inside the apartment.  Salmeron testified that Carbonneau stated that if he found anyone inside the apartment, he would shoot them.  (Docket Entry No. 95, Ex. 2 at 193:1–15).

Carbonneau quickly verified that no one was inside the apartment and returned to the patio.  Officers Carbonneau and Olivo then told the three boys to face the wall so they could be searched.  Officer Olivo acknowledged that he did not have a reasonable suspicion that Escobar or the other boys had assaulted Rodriguez or committed any other crime.  (Docket Entry No. 95, Ex. 1 at 106:9–19).  According to Officer Carbonneau, Escobar was not a suspect in any crime.  Nor did Carbonneau have any basis on which to arrest Escobar.

4

(Docket Entry No. 95, Ex. 6 at 141:2–8).  Officer Carbonneau stated that he intended to search the boys for weapons.  (*Id.* at 171:4–172:11).

Escobar became anxious and began to leave.  Carbonneau testified that he put his hand on Escobar's shoulder to guide him off the patio so they could talk and Carbonneau could calm him down.  (*Id.* at 123:5–24).  Officer Olivo testified that he heard a "commotion" between Officer Carbonneau and Escobar and heard Escobar yell, "[L]eave me alone.  I didn't do anything."  (Docket Entry No. 95, Ex. 1 at 111:11–15).  Olivo saw Escobar push Officer Carbonneau's hand away as he yelled for Carbonneau to leave him alone.  Escobar walked away from Carbonneau, obviously upset.  In response, Carbonneau followed Escobar and instructed him to turn around and give Carbonneau his hands.  (*Id.* at 117:1–12). Escobar backed away from the Carbonneau, who grabbed Escobar's hands and turned him around, securing the boy around his upper body.  Officer Olivo then grabbed Escobar's legs and the officers took Escobar to the ground.  Escobar fell onto his stomach with Officer Carbonneau on his back and Officer Olivo trying to control his legs.  Escobar continued to struggle.  (*Id.* at 121:1–21).  Jose Salmeron testified that when the officers took Escobar to the ground, he was screaming for his mother.  (Docket Entry No. 95, Ex. 2 at 196:10–22).

The officers succeeded in turning Escobar over onto his back.  (Docket Entry No. 95, Ex. 1 at 126:7–24).  Officer Olivo continued to hold down Escobar's legs while Officer Carbonneau worked to control his hands and upper body.  Neither Officer Olivo nor Officer Carbonneau used intermediate force techniques, such as pepper spray, to control Escobar. (*Id.* at 130:14–131:13).  After some additional struggle, Officer Olivo began twisting

Escobar's ankle to get him to turn back onto his stomach so he could be handcuffed.  (*Id.* at 128:2–129:9).  Officer Carbonneau stated that Escobar kicked him in the groin.  (Docket Entry No. 95, Ex. 6 at 160:22–161:3).  At least one eyewitness saw Escobar knee Officer Carbonneau and another heard Carbonneau state afterwards, "son of a bitch, he kicked me in the nuts."  (Docket Entry No. 95, Ex. 25 at 5–6).  Officer Carbonneau then drew his service revolver.  (Docket Entry No. 95, Ex. 6 at 162:8–162:24).

Carbonneau stated that he drew his gun because "I could not control him anymore.  To back off and give commands, because I couldn't get him in control."  (*Id.* at 162:25–163:4).  Carbonneau testified that he felt a blow to his hand.  Carbonneau's weapon fired.  (Docket Entry No 95, Ex. 25 at 11).  The bullet struck Escobar in the head just above the right eyebrow.

Carbonneau testified that he did not intend to fire the weapon.  Instead, the discharge was an accidental result of a blow to his hand while he was holding the weapon and pointing it at Escobar during the close-quarters struggle.  Carbonneau also stated, somewhat inconsistently, that when he fired, it appeared to him that Escobar was trying to pull something out of his waistband that Carbonneau suspected might be a weapon.  (Docket Entry No. 95, Ex. 25 at 11). At least one eyewitness supports Carbonneau's account, stating that he saw "either a leg or hand but something came up and then the gun went off."  (*Id.* at 5).  But other witnesses stated that they saw Officer Carbonneau, while on one knee, unholster his weapon, point it at Escobar's head and fire one round at close range.  (Docket Entry No. 95, Ex. 25 at 2).  Officer Olivo did not see Officer Carbonneau draw his weapon

or see what might have caused the weapon to discharge.  (Docket Entry No. 95, Ex. 1 at 133:4–13).

After the shooting, Carbonneau got up and slowly walked to his police car.  Officer Olivo radioed the police dispatcher to send an ambulance.  (Docket Entry No. 95, Ex. 1 at 140:16–19).  Escobar died at the scene.  An autopsy report confirmed that his death was caused by a gunshot wound to the head.  (Docket Entry No. 95, Ex. 25 at 12–13).  Escobar was unarmed.

Carbonneau went to the hospital by ambulance.  He was treated for injuries to his groin and left wrist.  (*Id.* at 2).  Carbonneau reported to his physician that his pain level was a 10 on a scale from 1 to 10.  (*Id.* at 13).  He was released later that evening and sent home. Carbonneau later resigned from the Houston Police Department.

The Houston Police Department conducted an internal affairs investigation.  The investigation concluded that Officer Carbonneau violated HPD policy by unholstering his weapon while he was in a close-contact struggle with Escobar.  (Docket Entry No. 95, Ex. 25 at 14).  Carbonneau also violated department policy by not using intermediate force techniques before using deadly force, and by not exercising sound judgment when drawing his duty weapon.  The investigation report states:

> In his statement submitted to the Homicide Division, Officer Carbonneau states he was concerned for his safety due to Eli Escobar's hand movements around his waist band and pants pocket.  However, neither Officer Carbonneau nor Officer Olivo claim to have ever seen a weapon on Eli Escobar nor was one found on him after the event.  Furthermore, witness statements are conflicting as to whether Eli Escobar did in fact attempt to place either hand in his pants pocket.  There is sufficient

evidence to prove that Eli Escobar was resisting both officers'
attempt to get him handcuffed.  However, the mere fact that he,
Escobar, may have been trying to place his hand or hands in his
pants pocket did not justify Officer Carbonneau's decision to
unholster and draw his duty weapon, especially when in close
proximity to his partner and a struggling suspect.  Officer
Carbonneau also contends that he drew his duty weapon because
Escobar kicked him in the testicles and he was about to
"collapse."  It should be noted that there are witnesses that
refute this contention as well, and state that Officer Carbonneau
was not kicked in the groin area.  However, even if Officer
Carbonneau had been kicked in the testicles, to the point of
incapacitation, as he contends, this still would not have
warranted the use of deadly force.  All the eyewitnesses state
that Escobar was attempting to flee and or struggling to resist
being handcuffed.  None of the witnesses stated that Escobar
was aggressively attacking Officers Carbonneau or Olivo.
Therefore, if the use of deadly force was unwarranted then the
act of Officer Carbonneau unholstering and drawing his duty
weapon was equally unwarranted.

(Docket Entry No. 95, Ex. 25 at 14).  The investigation found nothing improper about the

officers' questioning and brief detention of the three juveniles in the patio area outside the

apartment.  Nor did the investigation find improper Officer Carbonneau's detention of

Escobar after he walked away from the officers.  The investigation concluded that the

shooting was accidental and that Carbonneau did not intentionally discharge his weapon.  (*Id.*

at 15).

A Harris County, Texas grand jury indicted Officer Carbonneau for murder on March

10, 2004.  (Docket Entry No. 95, Ex. 25 at 3).  A jury found him guilty of criminally

negligent homicide on January 18, 2005.  (Def. Ex. 49).  Carbonneau was sentenced to nine

years, six months, and fourteen days in prison.  Following a sixty-day jail term, Carbonneau

received a suspended sentence and was placed on community supervision for five years.  (*Id.*).

Escobar's parents sued the City and Officer Carbonneau.  The plaintiffs allege that the following City customs or policies were a "moving force" in Escobar's death:  detaining individuals for questioning without individualized reasonable suspicion of criminal activity; searching individuals for contraband; and failing adequately to train police cadets and officers to handle their service weapons in high-stress situations.  The plaintiffs specifically argue that the City failed to give adequate training in "indexing," a basic technique for preventing accidental weapon discharges by  ensuring that an officer does not put his finger on the trigger unless and until the officer has decided to shoot.   The plaintiffs assert that the City had a policy of graduating police academy cadets who failed certain weapons-handling courses without remedial training.  The plaintiffs also claim that the City is liable under the Texas Tort Claims Act (TTCA), TEX. CIV. PRAC. & REM. CODE § 101.021 *et seq.*

The City has moved for summary judgment on all claims, arguing that the record evidence does not raise a fact issue material to determining whether the City violated Escobar's constitutional rights or that the City is liable under the TTCA.  The motion and response are analyzed below.

## II.      The Applicable Legal Standards

### A.      Summary Judgment

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  *See* FED. R. CIV. P. 56(c).  The movant bears the burden of identifying those portions of the record it believes demonstrate

the absence of a genuine issue of material fact. *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). If the burden of proof at trial lies with the nonmoving party, the movant may either (1) submit evidentiary documents that negate the existence of some material element of the opponent's claim or defense, or (2) if the crucial issue is one on which the opponent will bear the ultimate burden of proof at trial, demonstrate that the evidence in the record insufficiently supports an essential element or claim. *Celotex*, 477 U.S. at 330. The party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, but need not negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005). "An issue is material if its resolution could affect the outcome of the action." *DIRECTV, Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2005) (citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986)). If the moving party fails to meet its initial burden, the summary judgment motion must be denied, regardless of the nonmovant's response. *Baton Rouge Oil & Chem. Workers Union v. ExxonMobil Corp.*, 289 F.3d 373, 375 (5th Cir. 2002).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the allegations of its pleadings. The nonmovant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim. *Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 302 (5th Cir. 2004). This burden is not satisfied by "some metaphysical doubt as to the material facts," "conclusory allegations,"

"unsubstantiated assertions," or "only a scintilla of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1076 (5th Cir. 1994).

In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255. "Rule 56 mandates the entry of summary judgment, after adequate time for discovery, and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

### B.     Municipal Liability Under 42 U.S.C. § 1983

Municipal liability requires proof of an underlying claim of a violation of rights and three additional elements: "a policymaker; an official policy; and a violation of constitutional rights whose 'moving force' is the policy or custom." *Cox v. City of Dallas*, 430 F.3d 734, 748 (5th Cir. 2005). An "official policy" is either a policy statement, ordinance, or regulation that has been officially adopted by a policymaker, or a persistent, widespread practice of officials or employees, which although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents the municipality's policy. *Id.*; *Bd. of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 403–04 (1997). The policymaker must have either actual or constructive knowledge of the alleged policy or custom. *See Piotrowski v. City of Houston*, 237 F.3d 567, 579 (5th Cir. 2001) ("Actual or constructive knowledge of a custom must be attributable to the governing

11

body of the municipality or to an official to whom that body has delegated policy-making authority."); *Webster v. City of Houston*, 735 F.2d 838, 842 (5th Cir. 1984).

For the City to be liable based on an unconstitutional policy or custom, "the plaintiffs must show, among other things, either (1) that the policy itself violated federal law or authorized or directed the deprivation of federal rights or (2) that the policy was adopted or maintained by the municipality's policymakers with deliberate indifference as to its known or obvious consequences. . . . A showing of simple or even heightened negligence will not suffice." *Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 309 (5th Cir. 2004) (citing *Brown*, 520 U.S. at 407) (internal quotations omitted).

"It is clear that a municipality's policy of failing to train its police officers can give rise to § 1983 liability." *Brown v. Bryan County*, 219 F.3d 450, 457 (5th Cir. 2000) (citing *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)). When a plaintiff relies on a failure-to-train liability theory, he must show a causal link between the failure to train and the constitutional violation and must show that the failure to train amounts to deliberate indifference. *Estate of Davis ex rel. McCully v. City of N. Richland Hills*, 406 F.3d 375 (5th Cir. 2005); *City of Canton*, 489 U.S. 378. "Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Brown*, 520 U.S. at 410. "For an official to act with deliberate indifference, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Estate of Davis*, 406 F.3d at 381 (citations omitted). Deliberate indifference requires a showing of more than

negligence or even gross negligence.  "To satisfy the deliberate indifference prong, a plaintiff usually must demonstrate a pattern of violations and that the inadequacy of the training is 'obvious and obviously likely to result in a constitutional violation.'"  *Id.* (quoting *Thompson v. Upshur County*, 245 F.3d 447, 459 (5th Cir. 2001)).  "[I]t may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights," a municipality might reasonably be found to be deliberately indifferent.  *City of Canton*, 489 U.S. at 390; *see also Snyder v. Trepagnier*, 142 F.3d 791, 798 (5th Cir. 1998).  The Fifth Circuit has explained that in such cases,

> [c]onstructive knowledge may be attributed to the governing body on the ground that it would have known of the violations if it had properly exercised its responsibilities, as for example, where the violations were so persistent and widespread that they were the subject of prolonged public discussion or of a high degree of publicity.

*Webster*, 735 F.2d at 842 (citing *Bennett v. City of Slidell*, 728 F.2d 762, 768 (5th Cir.1984) (en banc), *cert. denied*, 472 U.S. 1016 (1985)).

A single incident is usually insufficient to demonstrate deliberate indifference.  *See, e.g.*, *Burge v. St. Tammany Parish*, 336 F.3d 363, 370 (5th Cir. 2003) (proof of deliberate indifference "generally requires a showing 'of more than a single instance of the lack of training or supervision causing a violation of constitutional rights'" (quoting *Thompson*, 245 F.3d at 459)); *Cousin v. Small*, 325 F.3d 627, 637 (5th Cir. 2003) ("[t]o succeed on his claim of failure to train or supervise" the plaintiff must demonstrate deliberate indifference, which usually requires a plaintiff to "demonstrate a pattern of violations"); *Cozzo v. Tangipahoa*

*Parish Council*, 279 F.3d 273, 288 (5th Cir. 2002); *Snyder*, 142 F.3d at 798 ("proof of a single violent incident ordinarily is insufficient" for liability; the "plaintiff must demonstrate 'at least a pattern of similar incidents in which the citizens were injured'").   Deliberate indifference requires that the plaintiffs "show that the failure to train reflects a 'deliberate' or 'conscious' choice to endanger constitutional rights."  *Snyder*, 142 F.3d at 799 (citing *City of Canton*, 489 U.S. at 389).  Notice of a pattern of similar violations is generally required. *See Roberts v. City of Shreveport*, 397 F.3d 287, 294 (5th Cir. 2005) (rejecting plaintiffs' proffered pattern where it required "an excessively high level of generality"); *see also Burge*, 336 F.3d at 371 (evidence "not sufficient to establish deliberate indifference or knowledge" that a constitutional violation "would be a highly likely consequence"); *cf. Brown*, 520 U.S. at 412 (holding that a finding of supervisory liability for inadequate screening "must depend on a finding that *this* officer was highly likely to inflict the *particular* injury suffered by the plaintiff").  While the specificity required should not be exaggerated, the cases require that the prior acts be fairly similar to what ultimately transpired.  *See, e.g.*, *Snyder*, 142 F.3d at 798 ("[P]laintiff must demonstrate at least a pattern of similar incidents in which the citizens were injured." (internal quotation marks and citation omitted)).

The Fifth Circuit has characterized the "single incident exception" to the general rule requiring a pattern of violations as inherently "a narrow one, and one that we have been reluctant to expand."  *Burge*, 336 F.3d at 373 (citing *Pineda v. City of Houston*, 291 F.3d 325, 334–35 (5th Cir. 2002)); *see also Gabriel v. City of Plano*, 202 F.3d 741, 745 (5th Cir. 2000) ("We have consistently rejected application of the single incident exception and have

noted that 'proof of a single violent incident ordinarily is insufficient to hold a municipality liable for inadequate training.'" (quoting *Snyder*, 142 F.3d at 798)); *Conner v. Travis County*, 209 F.3d 794, 797 (5th Cir. 2000). "To rely on this exception, a plaintiff must prove that the 'highly predictable' consequence of a failure to train would result in the specific injury suffered, and that the failure to train represented the 'moving force' behind the constitutional violation." *Roberts*, 397 F.3d at 295 (quoting *Brown*, 219 F.3d at 461). The Fifth Circuit found a single incident to suffice in *Brown v. Bryan County* because the county failed to provide any training or supervision for a young, inexperienced officer with a record of recklessness. *Brown*, 219 F.3d at 463. In *Roberts*, the court noted that there is a difference between a complete failure to train—as in *Brown*—and a failure to train in one limited area. *Roberts*, 397 F.3d at 295–96 (distinguishing *Brown v. Bryan County*).

## III.   The Objections to the Summary Judgment Evidence

### A.   The City's Motions to Exclude the Plaintiffs' Experts

The City has moved to exclude the testimony of the plaintiffs' experts, David Klinger and Stewart Ater. (Docket Entry Nos. 80, 81). The City contends that Klinger's opinions are unduly prejudicial, misleading, and irrelevant because he does not distinguish between model policing policies and constitutional requirements. (Docket Entry No. 81 at 7). The City moves to exclude Ater's opinions because he failed to conduct a neurological assessment on Escobar, because he is unqualified to opine on the adequacy of the City's crisis-intervention and de-escalation training, and because his opinions as to the effectiveness of a model policy are prejudicial, misleading, and irrelevant to determining whether the

City's crisis-intervention and de-escalation training were unconstitutional.  (Docket Entry

No. 80).

Rule 702 of the Federal Rules of Evidence states:

> [A] witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

FED. R. EVID. 702.

As a threshold matter, the trial judge must determine whether the proffered witness

is qualified to give the expert opinion he seeks to express.  *Kumho Tire Co. v. Carmichael*,

526 U.S. 137, 156 (1999); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 588 (1993).

The burden is on the party offering the expert testimony to establish by a preponderance of

the evidence that it is admissible.  *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 276 (5th Cir.

1998) (en banc).  The party offering the challenged expert opinions need not, however, prove

"that the expert's testimony is correct."  *Id.*  The district court must also make a "preliminary

assessment of whether the reasoning or methodology underlying the testimony is

scientifically valid [the reliability criterion] and of whether the reasoning or methodology can

be applied to the facts at issue [the relevance analysis]."  *Skidmore v. Precision Printing &

Packaging, Inc.*, 188 F.3d 606, 617 (5th Cir. 1999) (quoting *Daubert*, 509 U.S. at 592–93).

This "gate-keeping" obligation applies to all types of expert testimony, not just "scientific"

testimony.  *Id.* at 617–18 (citing *Kumho Tire*, 526 U.S. at 147).  The district court's

responsibility is "to make certain that an expert, whether basing testimony upon professional

studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152. The court "must ensure that the expert uses reliable methods to reach his opinions; and those opinions must be relevant to the facts of the case." *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004).

### 1. David Klinger

David Klinger has a Ph.D. in Sociology, a Masters of Science degree in Criminal Justice, and over twenty-five years of experience working in law enforcement, including as a police officer and a consultant on issues related to police training in the use of force. (Docket Entry No. 95, Ex. 47 at 2). He has served on numerous professional boards and organizations dealing with law enforcement training issues, has written articles on law enforcement procedures and policies, is an associate professor of criminology and criminal justice, and has served as a police-practices expert in several recent cases involving law enforcement policies and practices. Klinger has also conducted extensive research on officer-involved shootings, which he compiled into a book that was published in 2004 entitled *Into the Kill Zone: A Cop's Eye View of Deadly Force*. (*Id.* at 3).

It is not necessary, as the City argues, that Klinger have personally conducted studies on the effectiveness of certain training programs or prepared the programs for use by police departments. Klinger's knowledge and experience of police training techniques qualify him to serve as an expert on police training and policies.

17

Klinger offers opinions on the City's seizure and detention policies and use-of-force training provided to police officers.  He concludes that the City's seizure and detention policies are unconstitutional and that the City's training of its police officers was inadequate. Many of Klinger's opinions as to the adequacy of the City's police officer training also discuss his determination that the City did not meet widely accepted national policing standards.  As to the City's firearms training, Klinger states that under prevailing law-enforcement standards, police officers must have training on tactical use of firearms in real-life situations.  (Docket Entry No. 95, Ex. 47 at 10).  He identifies the types of firearms training required under prevailing law enforcement standards and states that ongoing periodic firearms practice is necessary to maintain proper technique.  Klinger concludes that after reviewing the Houston Police Department's firearms training regimen, comparing it to national standards, and analyzing it in conjunction with the facts in this case, the City failed adequately to train its officers and cadets in proper weapons handling.  (*Id.* at 10–17).

Klinger specifically states that HPD's training of cadets and officers on the proper location for a shooter's trigger finger before deciding to shoot is inadequate.  (*Id.* at 12–13). Klinger states that prevailing law enforcement standards teach officers to "index" their trigger fingers as a basic tenet of firearms handling.  "According to prevailing law enforcement standards, cadets and officers should be trained to keep their finger off the trigger until they plan to shoot." (*Id.* at 12).  According to Klinger, HPD's "Range Rules and Procedures" instructs its officers to "keep your finger out of the trigger guard until in the ready position."  (*Id.*).  Klinger states that the "ready position" is a "safe position" to hold a

18

weapon before the decision to shoot is made.  Klinger concludes that teaching officers to put their trigger finger inside the trigger guard once they are in the ready position but before they have decided to shoot could allow for accidental discharge.  "[A] policy that in any way condones the placement of the finger on the trigger in the ready position is grossly inadequate, a manifest safety hazard, and a deviation from widespread law enforcement customs, practices, and standards." (*Id.* at 13).

Klinger also states that HPD's policy of graduating police academy cadets who do not pass the "stress course" for handling firearms but receive no remedial training is contrary to prevailing standards on police training and creates potentially dangerous situations for citizens. (*Id.*).  Similarly, Klinger opines that HPD's decision to eliminate its tactical training "village" diminished the real-life-scenario training that HPD cadets and officers receive, further increasing the chance that officers in dangerous situations will lack the instinctive training necessary to respond without needlessly injuring or killing others.  (*Id.* at 14–15). Klinger also states that HPD's training in gun handling was inadequate because while officers were annually tested in target shooting, there was no similar requirement for firearms handling.  Klinger compares HPD's weapons training practices with those published by the International Association of Chiefs of Police ("IACP") and with other major cities' police departments, concluding that HPD's training is well below that required by most major cities and prevailing law-enforcement standards.  (*Id.* at 15–17).

The City objects to Klinger's testimony.  The City argues that its training programs are not required to meet national policing standards, but rather constitutional standards.  The

19

City argues that holding it to a higher standard, as Klinger does, is confusing and prejudicial.

Although the Fifth Circuit has not addressed the admissibility of expert testimony that compares a municipality's training program to nationally accepted standards, the circuit has noted that evidence that a municipality's hiring policy fell short of national standards is not sufficient to establish a section 1983 violation based on hiring decisions. *See Snyder v. Trepagnier*, 142 F.3d 791, 797 n.5 (5th Cir. 1998) (citing *Bd. of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 415–16 (1997); *Stokes v. Bullins*, 844 F.2d 269, 275 (5th Cir. 1988)). These cases did not, however, address whether such testimony is admissible; rather, these cases considered the testimony and concluded that it did not show a section 1983 claim. In *Snyder v. Trepagnier*, the Fifth Circuit examined that the evidence the plaintiff offered to show that the municipality's hiring policies were deficient. The evidence consisted largely of an expert's testimony on police operations and administration. The court held that this evidence was insufficient to show a constitutional violation. *Snyder*, 142 F.3d at 796–97 & n.5. In *Stokes v. Bullins*, the court held that a county that failed to request a National Crime Information Center check for police applicants did not act with deliberate indifference toward the rights of its citizens. *Stokes*, 844 F.2d at 275. Even though conducting a background check would have disclosed that the applicant (who later shot the plaintiff) had a long history of violent crime, the court stated that "an expert's opinion should not be alone sufficient to establish constitutional 'fault' by a municipality in a case of alleged omissions, where no facts support the inference that the town's motives were contrary to constitutional standards." *Id.* Although conducting a background check might have prevented the shooting, the court

found no factual basis that would make a background check a constitutional requirement.
*Id.*

Several circuit courts consider expert opinions on the adequacy of a city's training program, including opinions that rely on national training standards. Such expert testimony is relevant, although not dispositive, to determining whether a municipality's training program was constitutional. *See Young v. City of Providence*, 404 F.3d 4, 19 (1st Cir. 2005); *Gaddis ex rel. Gaddis v. Redford Twp.*, 364 F.3d 763, 775 (6th Cir. 2004); *Larkin v. St. Louis Hous. Auth. Dev. Corp.*, 355 F.3d 1114, 1118 (8th Cir. 2004); *Cottrell v. Caldwell*, 85 F.3d 1480, 1489–92 (11th Cir. 1996); *Zuchel v. City & County of Denver*, 997 F.2d 730, 739 (10th Cir. 1993); *Russo v. City of Cincinnati*, 953 F.2d 1036, 1047 (6th Cir. 1992) ("As an initial matter, we do not believe the opinions of experts are to be given no weight by this court, as the City apparently urges. Especially in the context of a failure to train claim, expert testimony may prove the sole avenue available to plaintiffs to call into question the adequacy of a municipality's training procedures. To disregard expert testimony in such cases would, we believe, carry with it the danger of effectively insulating a municipality from liability for injuries resulting directly from its indifference to the rights of citizens. Reliance on expert testimony is particularly appropriate where, as here, the conclusions rest directly upon the expert's review of materials provided by the City itself."); *Larez v. City of Los Angeles*, 946 F.2d 630, 635–36 (9th Cir. 1991). Although such expert testimony is insufficient by itself to establish municipal liability, *see Stokes*, 844 F.2d at 275, it may nonetheless be considered. Considering Klinger's opinions does not "constitutionalize" national law enforcement

standards, as the City argues.  The City's objections to Klinger's opinions as to the deficiencies in HPD's training as to the use of force and weapons-handling are overruled.

The City also argues that Klinger's opinions on the constitutionality of the officers' seizure and detention of Escobar and whether the City is liable for the unconstitutional action should be excluded.  The City argues that Klinger's opinion that the detention of Escobar was illegal under the *Terry* standard is incorrect because it ignores the Supreme Court's opinion in *Adams v. Williams*, 407 U.S. 143 (1972).

Klinger testified that under *Terry v. Ohio*, 392 U.S. 1 (1968), police officers have no legal authority to detain a person unless that officer has a reasonable, articulable suspicion that the person detained has committed, is committing, or is about to commit a crime. (Docket Entry No. 95, Ex. 47 at 7).  Klinger relies on the testimony of both Officer Carbonneau and Officer Olivo that they did not have reasonable suspicion to believe that Escobar was a suspect or that he had committed, was committing, or was about to commit a crime.  Klinger also relies on HPD's internal investigation of the Escobar shooting, which concluded that Carbonneau's detention of Escobar was "prudent."  Klinger concludes that HPD has a policy of allowing officers to detain individuals without reasonable suspicion, and that this is unconstitutional.  (*Id.* at 9).

In *Adams*, the Court held that a known informant's tip to a police officer that a suspect sitting in a nearby vehicle was carrying narcotics and had a gun "carried enough indicia of reliability to justify the officer's forcible stop of Williams."  *Adams*, 407 U.S. at 147.  *Adams* does not conflict with *Terry*, but *Adams* provides another basis on which an officer might

find reasonable suspicion to legally detain an individual.  The City's objection on this basis is overruled.  However, whether the detention of Escobar was constitutional or not is a matter of law, not a matter for expert opinion.  *See Kohl v. Lehlback*, 160 U.S. 293, 296 (1895) ("[G]eneral allegations in the petition that the petitioner is detained in violation of the Constitution . . . are averments of mere conclusions of law, and not of matters of fact.").  Because Klinger's opinion is premised on his determination that the detention of Escobar was unconstitutional, it is inadmissible.

The motion to exclude David Klinger's testimony is granted in part and denied in part.

### 2.    *Stewart Ater*

The City also moves to strike the opinions of the plaintiffs' expert, Stewart Ater. (Docket Entry No. 80).  Ater provides opinions on whether HPD's crisis-intervention training was adequate to prepare officers to respond to an individual like Escobar, who had behavioral issues and cognitive limitations.  The plaintiffs have responded to the City's motion to strike, (Docket Entry No. 99), but do not contend in their second amended complaint that the crisis-intervention training was inadequate and that this inadequacy caused Escobar's death.  (Docket Entry No. 119).  Nor do the plaintiffs refer to or rely on Ater's opinions in response to the City's summary judgment motion.  The motion to strike Ater's testimony is denied as moot.

### B.    Evidentiary Objections

The plaintiffs make numerous specific objections to the City's summary judgment evidence.  They argue that this court should not rely on the affidavits of various HPD and

City employees who may have an interest in the outcome of the litigation.  To the extent that the plaintiffs ask this court to make a general credibility determination that all HPD and City employees who testified are unreliable because they may have an interest in the outcome of the litigation, such a determination is inappropriate.  To the extent that the plaintiffs ask this court not to grant summary judgment based solely on the affidavits of party witnesses, this is not an objection to the evidence but an argument that the City has failed to establish that summary judgment is appropriate.  At summary judgment, the court draws all reasonable inferences from the evidence in the light most favorable to the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  "There is no reason why treatment of a Rule 56 motion which is supported by interested testimony should be different.  Separate treatment by trial courts of interested party proof amounts to improper judicial weighing of evidence."  EDWARD J. BRUNET & MARTIN H. REDISH, SUMMARY JUDGMENT: FEDERAL LAW AND PRACTICES 3D § 8.10 (2006).  The blanket objection to the party-witness affidavits and testimony is overruled.

The plaintiffs also argue that the City has provided voluminous records in its submissions but failed to provide the court with adequate guidance to analyze those materials.  The City's evidence, while voluminous and unindexed, is cited with sufficient specificity in the City's briefs to allow this court to identify the relevant documents.  Wholesale exclusion is unwarranted.  At the same time, a judge analyzing a summary judgment motion need not scour the record in search of evidence to support the positions.  *See Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003); *De La O v. Hous.*

24

*Auth. of El Paso, Tex.*, 417 F.3d 495, 501 (5th Cir. 2005) ("Judges are not like pigs, hunting for truffles buried in briefs.").

The plaintiffs object on the basis of hearsay to portions of HPD's internal affairs investigatory file, which is Exhibit 4 to the City's summary judgment motion. (Docket Entry No. 95 at 68). They also object to statements in the file made by persons that were not present when the shooting occurred. However, the plaintiffs do not identify specific pages or statements to which they object. The file is over 700 pages long. Nor do the plaintiffs object to the use of the internal affairs investigation report. To the contrary, both sides have submitted copies of that report and both sides rely on it.

Federal Rule of Evidence 803(8) excepts certain public records from the general rule that hearsay is inadmissible. Rule 803(8) states that the following is not excluded by the hearsay rule:

> Records, reports, statements, or data compilations, in any form,
> of public offices or agencies, setting forth (A) the activities of
> the office or agency, or (B) matters observed pursuant to duty
> imposed by law as to which matters there was a duty to report,
> excluding, however, in criminal cases matters observed by
> police officers and other law enforcement personnel, or (C) in
> civil actions and proceedings and against the Government in
> criminal cases, factual findings resulting from an investigation
> made pursuant to authority granted by law, unless the sources of
> information or other circumstances indicate lack of
> trustworthiness.

FED. R. EVID. 803(8). The internal affairs investigatory file appears to fall under Rule 803(8)(A) and (B); the report falls under Rule 803(8)(C). Without specific objections to particular parts of the file and report, the plaintiffs' objection is overruled.

25

The plaintiffs object to the City's Exhibit 10, which is a summary of the Supreme Court's decision in *Minnesota v. Dickerson*, as hearsay.  113 S. Ct. 2130 (1993).  The City argues that the summary is part of the HPD's police academy training materials.  The one-page document is labeled "MINNESOTA V. DICKERSON 113 S. Ct. 2130 (1993), Allowing Seizure of Contraband During Legal Pat-Down Searches." (Def. Ex. 10).[2]  The City submitted an affidavit of Rose Smith, HPD's custodian of records, who provided the predicate for admissibility.

The plaintiffs object to paragraphs 9 to 52 of Albert Rodriguez's affidavit as conclusory and lacking proper predicate or foundation.  (Docket Entry No. 95 at 68).  Rodriguez is the commander of the training academy for the Texas Department of Public Safety.  The City designated Rodriguez as an expert.  In paragraph 8, Rodriguez lists fifty sources he researched in reaching his conclusions.  He also states that he personally visited the site of the shooting at the Burnham Woods apartment complex.  (Def. Ex. 11 at 3).  The plaintiffs' objection lacks merit.  The City is required to have its expert disclose the sources he considered in reaching his opinions.  FED. R. CIV. P. 26(a)(2)(B)(ii).  To be considered on summary judgment, an expert's opinion must identify the materials on which the expert based that opinion, as well as the reasoning process underlying the opinion.  *Celestine v. Petroleos de Venezuella SA*, 266 F.3d 343, 357 (5th Cir. 2001) (citing *Boyd v. State Farm*

---

[2]  The City's summary judgment evidence consists of exhibits numbered 1 through 66.  The exhibit numbers run continuously through the City's motion and replies.  In this memorandum and opinion, the court refers to the City's exhibits as "(Def. Ex. __)" rather than as "(Docket Entry No. __, Ex. __)."

*Ins. Cos.*, 158 F.3d 326, 331 (5th Cir. 1998).  Rodriguez's affidavit explains both. The plaintiffs' objection is overruled.

The plaintiffs object to paragraph 38 of Rodriguez's affidavit as hearsay.  (Docket Entry No. 95 at 68).  Paragraph 38 cites and quotes a 2002 investigation into HPD's training academy.  Rule 703 of the Federal Rules of Evidence states that an expert may rely on facts or data that are not admissible in evidence in forming opinions or inferences, if those facts or data are "of a type reasonably relied upon by experts in the particular field."  The Fifth Circuit has explained the rule on an expert's use of hearsay information:

> Expert witness testimony is a widely-recognized exception to the rule against hearsay testimony.  It has long been the rule of evidence in the federal courts that an expert witness can express an opinion . . . even though his opinion is based in part or solely upon hearsay sources.  The rationale for this exception to the rule against hearsay is that the expert, because of his professional knowledge and ability, is competent to judge for himself the reliability of the records and statements on which he bases his expert opinion.  Moreover, the opinion of expert witnesses must invariably rest, at least in part, upon sources that can never be proven in court.  An expert's opinion is derived not only from records and data but from education and from a lifetime of experience.  Thus, when the expert witness has consulted numerous sources, and uses that information, together with his own professional knowledge and experience, to arrive at his opinion, that opinion is regarded as evidence in its own right and not as hearsay in disguise.

*LaCombe v. A-T-O, Inc.*, 679 F.2d 431, 436 n.5 (5th Cir. 1982) (internal citations omitted). The objection is overruled.

The plaintiffs object to paragraph 41 of Rodriguez's affidavit on the basis that it mischaracterizes testimony and is irrelevant. (Docket Entry No. 95 at 69).  In that paragraph,

Rodriguez refers to various HPD officers' testimony and concludes that this evidence shows that HPD adequately "trains, supervises, and guides its law enforcement officer[s]."  (Def. Ex. 11 at 23).  Both sides have asked experts to draw inferences and opinions based in part on the officers' testimony and statements.  The plaintiffs do not explain how paragraph 41 is so misleading as to require exclusion.  The objection is overruled.

The plaintiffs object to the reports and supplemental affidavits of the City's other designated experts, Michael Dirden, C.O. Bradford, Joe L. Breshears, Jimmy Conley, Terry Bratton, Terry Wolfe, Al Baker, David E. Watkins, and John Lambert.  (Docket Entry No. 95 at 69–70; Docket Entry No. 127 at 17; Docket Entry No. 134 at 6.)  The plaintiffs object on the same basis they objected to Rodriguez's affidavit: hearsay, conclusory, and improper predicate and foundation.  (Docket Entry No. 95 at 68–69).  The plaintiffs have not otherwise challenged the City's experts under *Daubert*.  For the reasons stated above, the objections are overruled.

The plaintiffs object to the City's Exhibit 20, which is a copy of a letter from Los Angeles Police Deputy Chief Gary Brennan to C.O. Bradford, HPD's Chief of Police.  The letter contains the seal of the Los Angeles Police Department and the signature of Deputy Chief Brennan.  The City fails to lay a proper predicate for the letter.  The objection is sustained.

The plaintiffs object to Exhibit 27, which is Exhibits 12 to 21 to C.O. Bradford's deposition.   The plaintiffs argue that these exhibits contain hearsay, lack proper authentication and predicate, and are irrelevant.  (Docket Entry No. 95 at 70).   During

28

Bradford's deposition, plaintiffs' counsel objected to testimony about Exhibits 12 to 21, asserting that the documents "speak for themselves." (Docket Entry No. 95, Ex. 11 at 185:1–197:15). That objection goes to Bradford's testimony about the documents rather than to the documents themselves. Counsel also objected to Exhibit 12 as irrelevant and to Exhibits 15 and 16 as vague and ambiguous. (*Id.* at 185:1–190:5).[3]

Exhibits 12 to 21 to Bradford's deposition are letters and certificates of commendation to members of HPD for different accomplishments, ranging from extra work done in connection with an office relocation to seminars on kidnaping, gang violence, and other topics, to hosting a conference of police chiefs. A few of the letters are no more than thank-you notes from individuals who found a particular training program helpful. These materials are irrelevant. The objection is sustained.

The plaintiffs object to Exhibits 31 and 44, which are copies of lesson plans from HPD's police academy prepared on September 12, 2002. The exhibits do not otherwise indicate which cadet classes received these lesson plans. The evidence shows that Officer Carbonneau graduated from the police academy on June 14, 2002. (Docket Entry No. 95, Ex. 46). Without information as to whether identical or similar plans were used before September 12, 2002, these exhibits are irrelevant. The objection is sustained.

---

[3]   Federal Rule of Civil Procedure 32(d)(3)(A) provides that "[o]bjections . . . to the competency, relevancy, or materiality of testimony are not waived by failure to make them before or during the taking of the deposition, unless the ground of the objection is one which might have been obviated or removed if presented at that time." FED. R. CIV. P. 32(d)(3)(A). The plaintiffs' objections to the exhibits to Bradford's deposition on hearsay and other grounds are not waived by the failure to make them during the deposition.

The plaintiffs object to Exhibit 34, which is Officer Carbonneau's nearly 600-page response to the plaintiffs' first request for production.  (Docket Entry No. 127 at 17).  In submitting this extensive and unorganized exhibit to the court, the City notes that "[d]ocuments Carbonneau produced to the other parties in Response to Plaintiffs's [sic] First Request for Production affirmatively show that Carbonneau was taught indexing. Carbonneau's response to plaintiffs's [sic] Request for Production is Exhibit 34." (Docket Entry No. 100 at 9).  The City fails to identify which documents in, or pages of, the 700-page response it would like the court to consider in support of its contention that Carbonneau was taught indexing.  The objection is sustained.

The plaintiffs object to Exhibit 35, which consists of the January 14, 2005 testimony of Dr. William Joseph Lewinski, an expert in police psychology, on behalf of Officer Carbonneau during his criminal trial, and the closing arguments of counsel in that trial.  The plaintiffs argue that Dr. Lewinski was not designated as an expert in this case and that the closing arguments of counsel are irrelevant.  (Docket Entry No. 127 at 17).  Rule 804(b)(1) states that the hearsay rule does not exclude the following:

> Testimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.

FED. R. EVID. 804(b)(1).  The transcript of Carbonneau's criminal trial does not show that counsel for the plaintiffs had an opportunity to question Dr. Lewinski or participated in that

case. The plaintiffs in this civil suit did not have a similar motive as the State had in Carbonneau's criminal trial to cross-examine Dr. Lewinski. The arguments of counsel in the criminal case are irrelevant to the summary judgment issues raised in this case. The objection is sustained.

Finally, the plaintiffs object to Exhibits 52 and 53, which are a list of all firearms courses HPD provides and lesson plans for high-stress scenarios.[4] (Docket Entry No. 134 at 6). The plaintiffs argue that the documents are irrelevant because, like the police academy lesson plans found at Exhibits 31 and 44, there is no indication whether Officer Carbonneau received any of the instruction described in those exhibits. Because the City has not identified evidence as to when the training described in Exhibits 52 and 53 was provided, the objection to relevance is sustained.

The City objects to the plaintiffs' June 15, 2007 filing of their "Reply to Defendant's Response to Plaintiffs' Sur-reply to Defendant City of Houston's Reply to Plaintiffs' Response to Defendant's Motion for Summary Judgment." (Docket Entry No. 134). The City contends that this reply was filed late and in violation of this court's February 20, 2007 ruling allowing the plaintiffs to supplement their summary judgment response. (Docket Entry No. 135). This court's February 20, 2007 order stated that after receiving additional HPD internal affairs investigation documents from the City, the plaintiffs could supplement their response to the summary judgment motion by April 9, 2007. The City was to reply by

---

[4] The plaintiffs mistakenly object to "Exhibit 54." (Docket Entry No. 134 at 6). The material to which they object, documents in the bates range 8633–8640, is found at Exhibit 53.

April 30, 2007.  (Docket Entry No. 121).  The ruling made no mention of additional replies.
But because the additional internal affairs division records were produced at such a late date,
the plaintiffs may file Docket Entry No. 134.  The City's objection is overruled.

### C.    The Plaintiffs' Spoliation Claim

The plaintiffs allege that the City failed to preserve the records of HPD electronic
communications in the twenty-four hours after Escobar's death.  (Docket Entry No. 95 at 67).
The plaintiffs state that they provided notice to the City of their claim within sixty days after
the shooting and that HPD's electronic communications in the twenty-four hours after the
shooting "were likely to discuss events that occurred after Eli's shooting."  (*Id.*).  The
plaintiffs point to the testimony of Al Garcia, HPD's chief technology officer, who stated that
HPD policy was to keep "mobile digital terminal transmissions" for ninety days.  (Docket
Entry No. 95, Ex. 16 at 139:21–140:9).  The plaintiffs argue, based on this testimony, that
the destruction of the electronic communications after they provided the City notice of the
claim violated the City's preservation obligation.  The plaintiffs seek sanctions for spoliation
in the form of an adverse-inference instruction.

The City responds that the plaintiffs' notice of claim letter did not specifically request
all electronic communications occurring after Escobar's death.  The City states that it was
not aware that the plaintiffs wanted all electronic communications records occurring within
twenty-four hours after Escobar's death until almost two years after the shooting.  The City
argues that it preserved the materials it believed were relevant, including the homicide file

32

containing relevant video and audio files, the internal affairs investigation file, and the record of the 911 calls.  (Docket Entry No. 100 at 21).

"The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 216 (S.D.N.Y. 2003) (quoting *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 436 (2d Cir. 2001)) (additional citations omitted).  Spoliation is "the destruction of evidence . . . or the significant and meaningful alteration of a document or instrument." *Andrade Garcia v. Columbia Med. Ctr.*, 996 F. Supp. 605, 615 (E.D. Tex. 1998) (internal quotation marks omitted).  If a party with a duty to preserve evidence fails to do so and acts with culpability, a court may impose sanctions.  FED. R. CIV. P. 37(c)(1).  A sanction may include an instruction that if a party that destroys or loses evidence subject to a preservation obligation, the fact finder may presume that the evidence was prejudicial. *FDIC v. Hurwitz*, 384 F. Supp. 2d 1039, 1099 (S.D. Tex. 2005) (citing *Nation-Wide Check Corp. v. Forest Hills Distribs., Inc.*, 692 F.2d 214, 217–18 (1st Cir. 1982)).  In the Fifth Circuit, a severe sanction for spoliation, including an adverse-inference instruction, requires a showing of bad faith. *King v. Ill. Cent. R.R.*, 337 F.3d 550, 556 (5th Cir. 2003) (citing *United States v. Wise*, 221 F.3d 140, 156 (5th Cir. 2000)).[5]

---

[5] Federal courts may sanction parties and their attorneys for refusing to obey discovery orders.  (FED. R. CIV. P. 37).  Rule 37(f) applies to electronically stored information.  It states:

> Absent exceptional circumstances, a court may not impose sanctions under these rules on a party for failing to provide electronically stored information lost as a result of the routine, good-faith operation of an electronic information system.

The City's argument that it was not aware that it had a preservation obligation for electronically stored information is weak.  Courts have recognized that preservation obligations attach to information that is reasonably likely to be relevant to filed or anticipated litigation, regardless of how that information is recorded.  *See Stevenson v. Union Pac. R.R. Co.*, 354 F.3d 739 (8th Cir. 2004) (affirming the district court's imposition of a sanction of an adverse inference instruction after finding that the defendant railroad company had destroyed railroad track maintenance records "in circumstances where it knew or should have known that the documents would become material and should have preserved them"); *Zubulake*, 229 F.R.D. 422 (finding that the defendant failed to preserve relevant e-mails, even after receiving adequate warnings from counsel, and imposing sanctions).  The threshold issue is whether and when the City knew or should have know that electronic communications exchanged the day after a police shooting in November 2003 were likely to contain information about that shooting.

Chief Breshears testified that although e-mail was available to HPD staff, he did not use it commonly himself.  (Docket Entry No. 95, Ex. 12, at 67).  Alberto L. Garcia, the City's Chief Technology Officer, explained in his deposition that officers like Carbonneau and Olivo would not have e-mail.  "The officers that work in the car mainly, the ones that have patrol-type jobs, would not have e-mail . . . simply because they spend the majority of their

---

Federal courts may sanction parties, and their attorneys, using their inherent power to fashion and impose appropriate sanctions for conduct that abuses the judicial process, *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43–46 (1991), but such inherent power applies only when the parties' conduct is not controlled by other mechanisms, *Natural Gas Pipeline Co. of Am. v. Energy Gathering, Inc.*, 2 F.3d 1397, 1408 (5th Cir. 1993).

.

34

time mobile and wouldn't have access to it—using our current technology, they wouldn't have access to e-mail in the car.  They would have to go into an office environment to do it." (*Id.*, Ex. 16 at 57).  In contrast, "the [t]he majority of investigative officers . . . in the investigative division and the administrative and support officers and, obviously, most of the civilians would all have e-mail accounts."  (*Id.*, Ex. 16 at 57).  Garcia also testified that HPD employees cannot access their work e-mail from home.  (*Id.*, Ex. 16 at 63).  The evidence also shows that under HPD's document retention and destruction policy, electronic communications records were routinely destroyed within ninety days.

The record does not provide a basis for such a severe sanction as an adverse-inference instruction because there is no showing that relevant electronic communications were destroyed or that the destruction occurred in bad faith.  *See Condrey v. Suntrust Bank of Georgia*, 431 F.3d 191, 203 (5th Cir. 2005) (the party moving for sanctions had not shown evidence of bad faith and could not identify specific evidence that had been destroyed or who had destroyed it); *King v. Illinois Central Railroad*, 337 F.3d at 556 (if a party is unaware when evidence is destroyed that it might be relevant to a claim and the evidence is destroyed as part of routine file maintenance, there is no showing of bad-faith destruction).  And under Rule 37(f) of the Federal Rules of Civil Procedure, if the electronic communications were destroyed in the routine operation of the HPD's computer system, and if there is no evidence of bad faith in the operation of the system that led to the destruction of the communications, sanctions are not appropriate.

The plaintiffs offer only speculation that the electronic communications that were destroyed are "likely to discuss events that occurred after Eli's shooting." The record shows that the officers involved in the shooting were not likely to have used e-mail to communicate about the event in the day after it occurred. The plaintiffs do not point to specific evidence in the record demonstrating that the City knew that information relevant to the shooting was being destroyed because of the feature of the computer system's routine operation that e-mails were destroyed after ninety days. The City has also demonstrated that when it anticipated that information or records would likely be relevant to the shooting, such information and records were preserved. For example, the City preserved the record of the 911 calls related to the shooting and the files of the internal investigation into the shooting.

The plaintiffs have not made a showing that the City's destruction of its electronic communications was done in bad faith. Without evidence that the information was relevant or was destroyed in bad faith, this court cannot impose the severe sanction the plaintiffs seek. *See Toon v. Wackenhut Corrections Corp.*, 250 F.3d 950, 952 (5th Cir. 2001). The motion for sanctions is denied.

## IV.    The Claim of Municipal Liability for Unreasonable Search and Detention

The plaintiffs allege that the City has an unconstitutional official policy of allowing its officers to detain individuals without probable cause for their arrest. As evidence of the policy, the plaintiffs point to HPD's internal investigation into the circumstances surrounding Escobar's death. In its report, the internal affairs division concluded that Officer Carbonneau

had not violated HPD policy in detaining the three juveniles at the Sanchez apartment.

(Docket Entry No. 95, Ex. 25 at 14).  The report stated:

> Officer Carbonneau's actions were prudent in attempting to detain Eli Escobar, who was attempting to immediately flee the enclosed patio to [the Sanchez apartment], before Officers Olivo and Carbonneau could determine if the suspect they were in search of, Oscar Sanchez, was one of the three juveniles being detained.

*Id.*

HPD Assistant Chief of Police Michael Anthony Dirden confirmed that Carbonneau did not violate HPD policy by detaining Escobar as he attempted to leave the officers' presence.  Dirden stated that "there was nothing wrong with the circumstances regarding the detention; that the officers in attempting to detain Eli Escobar, were perfectly within their right as law enforcement officers."  (Docket Entry No. 95, Ex. 14 at 95:13–17).  HPD Chief of Police C.O. Bradford also that Officer Carbonneau's detention of Escobar did not violate HPD policy.  (Docket Entry No. 95, Ex. 11 at 129:18–25).

Officer Jim Conley, a training officer at HPD's police academy, testified as follows:

> Q:   Okay.  Did the police officer have the constitutional right to stop Mr. Escobar under those circumstances?
>
> A:   I believe so, yes, sir.
>
> Q:   All right.  And why so?
>
> A:   Because, again, he's in—they're going to the home where Oscar is supposed to be.  They don't know where he is for sure, who he is.  There are other people in the house who may have been involved in it.  I think they have the right to detain him, yes, sir.
>
> . . . .

Q:      Now, does a citizen have a duty to participate in an investigation if they elect not to?

A:      In this case, they do.  Again, they have the—they have the belief that Oscar was in this apartment.  I think a reasonable person would believe if Oscar's not here, they would know where he is.  I think they do have a duty to talk to the officers and let them know.

Q:      If they tell him, "I don't know where Oscar is," after that, do they have any other duty, sir?

. . . .

A:      I think they have a duty to give the officers the information they're trying to find out.

Q:      All right.  What is your legal basis for your belief, sir?

A:      Again, they have the reasonable suspicion that—

Q:      Of what?

A:      The assault has been committed by Oscar, who lives in this apartment.

(Docket Entry No. 95, Ex. 10 at 104:23–105:8, 120:21–121:22).

An unconstitutional official policy may make a municipality liable under section 1983. *Piotrowski*, 237 F.3d at 579.  If a policy is facially unconstitutional, the policymaker is presumed to have knowledge of the policy and the likelihood that constitutional violations will result.  *Burge*, 336 F.3d at 369.  To decide whether this presumption applies, courts must determine whether the policy in question is constitutional "on its face"—that is, by its terms. *See, e.g.*, *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 661, 694-95 (1978) (city policy compelling pregnant employees to take unpaid leaves of absence before such leaves were medically necessary violated plaintiffs' constitutional rights and gave rise to cause of action

38

against the city under section 1983); *Gomillion v. Lightfoot*, 364 U.S. 339 (1960) (Alabama statute excluding 99% of blacks from voting was unconstitutional on its face); *Strauder v. West Virginia*, 100 U.S. 303 (1879) (West Virginia law prohibiting blacks from jury service *per se* unconstitutional).

Even a facially inoffensive policy may support municipal liability if "promulgated with deliberate indifference to the 'known or obvious consequences' that constitutional violations would result." *Piotrowski*, 237 F.3d at 579 (quoting *Brown*, 520 U.S. at 407) ("Deliberate indifference . . . is a stringent test, and 'a showing of simple or even heightened negligence will not suffice' to prove municipal culpability."). A heightened standard of proof applies to a claim based on a facially innocuous policy. *See, e.g.*, *Victoria W. v. Larpenter*, 369 F.3d 475, 482 (5th Cir. 2004) (quoting *Brown*, 520 U.S. at 405) ("[W]hen the claim is that while a municipal policy itself did not violate federal law, it caused another actor to inflict the injury, 'rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee.'").

There are three general types of encounters between police and individuals. A "consensual encounter," in which the individual willingly agrees to speak to police, may be initiated by police without any objective level of suspicion. Without more, a consensual encounter does not amount to a Fourth Amendment "seizure." *United States v. Cooper*, 43 F.3d 140, 145 (5th Cir. 1995) (citing *Florida v. Bostick*, 501 U.S. 429, 435 (1991)). A "limited investigative stop" is permissible if there is a "reasonable suspicion" that a person has committed or is about to commit a crime. An arrest must be based on probable cause.

*Id.* at 146.  In determining whether a Fourth Amendment "seizure" has occurred, a court must examine whether, based on the totality of the circumstances, a reasonable person would have believed that he was free to leave or to refuse to consent to a search.  *See Bostick*, 501 U.S. at 437; *United States v. Gonzales*, 79 F.3d 413, 420 (5th Cir.), *cert. denied*, 519 U.S. 869 (1996); *see also INS v. Delgado*, 466 U.S. 210, 215 (1984) (stating that a consensual encounter between an officer and a citizen "can be transformed into a seizure or detention within the meaning of the Fourth Amendment, if, in view of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.").  The test is objective.  *Michigan v. Chesternut*, 486 U.S. 567, 573–74 (1988).  This objective analysis, focusing on the officers' conduct and the context in which it occurs, allows law enforcement officers to know whether their conduct will violate the Fourth Amendment.  *Id.*

A seizure violates the Fourth Amendment only if unreasonable.  *See Ohio v. Robinette*, 519 U.S. 33, 39 (1996) (stating that the "touchstone of the Fourth Amendment is reasonableness" (quoting *Florida v. Jimeno*, 500 U.S. 248, 250 (1991))).  "Reasonableness, in turn, is measured in objective terms by examining the totality of the circumstances."  *Id.* "[W]arrantless searches and seizures are *per se* unreasonable unless they fall within a few narrowly defined exceptions."  *United States v. Ho*, 94 F.3d 932, 935 (5th Cir. 1996) (citing *United States v. Cardenas*, 9 F.3d 1139, 1147 (5th Cir. 1993)).  In general, a restraint amounting to a Fourth Amendment seizure is invalid unless justified by probable cause.  *See United States v. Odutayo*, 406 F.3d 386, 390–91 (5th Cir. 2005).  While mere police questioning does not constitute a seizure, the continued detention of an individual without

40

reasonable suspicion that the individual has committed a crime or is about to commit a crime violates that person's Fourth Amendment right to be free from an unreasonable seizure. *Delgado*, 466 U.S. at 216 (citing *Brown v. Texas*, 443 U.S. 47, 49 (1979)).  When an officer, by means of physical force or show of authority, has restrained the liberty of a citizen, a seizure has occurred.  *Id.*

Certain limited investigative stops or detentions known as *Terry* stops are justifiable if there is a "reasonable, articulable suspicion that a person has committed or is about to commit a crime."  *United States v. Chavez*, 281 F.3d 479, 485 (5th Cir. 2002) (citing *Terry*, 392 U.S. at 21).  "Reasonable suspicion" is "considerably easier for the Government to establish than probable cause."  *United States v. Tellez*, 11 F.3d 530, 532 (5th Cir. 1993), *cert. denied*, 511 U.S. 1060 (1994) (citing *United States v. Wangler*, 987 F.2d 228, 230 (5th Cir. 1993)).  Under the reasonable-suspicion standard, searches and seizures are unreasonable in the absence of individualized suspicion of wrongdoing.  *See Chandler v. Miller*, 520 U.S. 305, 308 (1997).  In the context of a *Terry* stop, an officer "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion."  *Terry*, 392 U.S. at 21; *accord United States v. Sokolow*, 490 U.S. 1, 7 (1989); *Delaware v. Prouse*, 440 U.S. 648, 653–55 (1979).

The following exchange occurred during Officer Carbonneau's deposition:

> Q:   All right.  Up until that point—that is, when you put your hands on Eli—he had not committed any kind of offense, to your knowledge.  Is that correct?
>
> A:   Not that I was aware of.

41

> Q:    All right, sir.  And you had no basis to believe that he
>        was involved in any kind of wrongdoing of any type,
>        right?
>
> A:    Not that I was aware of.

(Docket Entry No. 95, Ex. 6 at 135:10–18).  Carbonneau stated that he wanted to detain

Escobar to determine what his "statement was in the incidence [sic]."  (*Id.* at 141:17–18).

Officer Olivo stated that he did not believe any of the three boys was Oscar and did

not believe that Escobar had anything to do with the assault on Rodriguez.  (Docket Entry

No. 95, Ex. 1 at 100:3–101:2).  The plaintiffs argue that without an articulable reason for

detaining Escobar, Carbonneau violated Escobar's Fourth Amendment rights.

The City responds that reasonable suspicion for the detention was present because the

officers were investigating an assault allegedly committed by a person who lived at the

apartment in which the three boys were found.  (Docket Entry No. 100 at 2).  The City points

to a different part of Officer Carbonneau's testimony, in which he states that none of the

three boys had been eliminated as suspects when Escobar was detained.  Carbonneau testified

as follows:

> Q:    All right, sir.  Now, despite your having lined them up,
>        eliminated Eli as a suspect, you went into the apartment.
>        Is that correct?
>
> A:    We didn't eliminate anybody right yet as a suspect or
>        being—knowing—or something about it.  They were all
>        just still there being waited to talk to.
>
> Q:    All right.  Well, why were you detaining them?
>
> A:    To get information on what happened, the incident that
>        occurred.

> Q:      Did anybody there tell you that they were physically
>         present at the scene of the alleged assault?
>
> A:      I didn't have time to get to that.

(Docket Entry No. 95, Ex. 6 at 101:10–24).   In a statement provided the day after the

shooting, Carbonneau described what happened when he was talking to Escobar on the patio:

> I was asking [Escobar] what his name was and . . . trying to
> determine if he was Oscar or if one of the other juveniles was
> Oscar. . . .
>
> Almost immediately from the time I began speaking with him,
> [Escobar] was extremely hostile towards me.  In a very angry
> voice, he was telling me things like 'I don't have to talk to you,
> I didn't do anything wrong.'  I told [him] to calm down and that
> I just wanted to talk to him and find out who he was. [Escobar]
> would not calm down and continued to speak to me in an angry
> and defiant tone.
>
> . . . He was standing in the exit way off the patio.  I didn't think
> it was a good idea to be blocked in to the enclosed patio.  I
> placed my hand on [Escobar's] shoulder and asked him to step
> out to the sidewalk area. [Escobar] grabbed my left wrist and
> twisted it as he pulled it off of him.  [Escobar] pushed off of me
> to leave the patio area towards an open sidewalk area. . . .
>
> [Escobar] had his hands near his waistband, which made me a
> little nervous.  Since we had come from a scene where a
> burglary/assault had taken place, I was aware of the possibility
> that the male suspect I was speaking with might have been
> involved and was becoming physically combative.   Since
> Officer Olivo and I had not detained or frisked anyone up to this
> point, there remained the possibility that [Escobar] had a
> weapon in his possession.  At this point, I asked [him] to go
> ahead and keep his hands where I could see them.
>
> [Escobar] became even more defiant when I told him to show
> me his hands. [Escobar] was saying things like "This is bullshit,
> leave me alone, fuck this, I didn't do anything wrong."  This

was now becoming a safety issue.  There were several other individuals on the patio behind me, and the one I was speaking to was openly belligerent for no apparent reason.  I was working on the assumption that he was possibly involved in the prior assault incident and possibly had a weapon.

Since verbal commands were obviously not working with this suspect, I reached out to put my hand on the suspect's shoulder and told him in a firm voice "You need to relax and give me your hands."  I decided that I was going to have to go ahead and handcuff [him] and pat him down to make sure that he didn't have any weapons.

(Def. Ex. 4 at 2335–2336).

The City's expert, Albert Rodriguez, states that a reasonable officer in the same circumstances would have detained Escobar to determine if he had any information relevant to the assault.  (Def. Ex. 11 at 5).  The expert opined that a law-enforcement officer reasonably would have believed that Escobar's nervousness and belligerence provided a basis to detain and question him.  (*Id.* at 7).

Although the description of Oscar that Matthew Rodriguez gave the police officers did not match Escobar's appearance, it is not clear that Officers Carbonneau and Olivo lacked reasonable suspicion to detain the boys for questioning.  The officers were told that Oscar lived at the apartment where they found Jose Sanchez, Jose Salmeron, and Eli Escobar playing video games.  It was reasonable to conclude that these boys knew Oscar and where he might be.  Moreover, Officer Carbonneau stated that he had not eliminated any of the juveniles as suspects when Escobar began to act defiantly.  Although Officer Olivo stated that he did not have a reasonable suspicion that the juveniles were involved in the assault on Rodriguez, the record shows that it was Officer Carbonneau who was interviewing Escobar

while Olivo was on the opposite side of the patio talking with one of the other boys.  (Docket Entry No. 95, Ex. 1 at 105:11–107:3).  Olivo was not paying attention to Carbonneau or Escobar and the other boy.  (*Id.* at 109:6–9).

Very little time passed between when the boys came out of the apartment in response to the officers' knock at the door and when Escobar began exhibiting belligerent and evasive behavior.  Carbonneau stated that during that brief period, he was unable to determine the extent of the boys' involvement, if any, in the assault on Rodriguez.  Escobar's behavior gave Carbonneau reason to believe that he knew something about the alleged assault, about Oscar, or about Oscar's whereabouts.  Carbonneau has provided articulable facts to support a reasonable suspicion that Escobar was involved in or knowledgeable about the assault in some way, including whether he knew where the person identified as the perpetrator could be found.  *See Adams v. Williams*, 407 U.S. 143, 145–46 (1972) ("A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time."); *see also U.S. v. Michelletti*, 13 F.3d 838, 844 (5th Cir. 1994) (stating that a court must consider that "the reality that the setting in which the police officer acts may reasonably and significantly affect his decisional calculus"); *Goodson v. City of Corpus Christi*, 202 F.3d 730, 736–37 (5th Cir. 2000) (citing *U.S. v. Halloway*, 962 F.2d 451, 459 (5th Cir. 1992)) ("Factors that ordinarily constitute innocent behavior may provide a composite picture sufficient to raise reasonable suspicion in the minds of experienced

officers.").  The plaintiffs have not raised a disputed fact issue material to determining whether Officer Carbonneau violated Escobar's right to be free from an illegal detention.

Even if the plaintiffs had made this showing, however, the record does not raise a fact issue as to whether the City had a policy or custom of improperly detaining individuals without reasonable suspicion.  The internal affairs division investigation and HPD officials who testified concluded that Carbonneau had reasonable suspicion to detain Escobar, but this is not evidence of an unconstitutional policy or custom.  Nor does it provide evidence that policymakers had actual or constructive knowledge of a pattern of unconstitutional seizures. *See Pineda*, 291 F.3d at 330–31 ("These offense reports are insufficient to establish *actual* knowledge of a pattern even in the hypothetical case that the plaintiffs provided proof that the policymakers had read the *individual* reports.  It follows, then, that there can be no constructive knowledge of an unconstitutional custom from the reports passing through the 'chain of command' in summary form.").

Finally, the plaintiffs have not raised a fact issue as to whether any policy or custom of detention absent reasonable suspicion was the "moving force" behind Escobar's death. *See Johnson*, 379 F.3d at 310.  "[A] direct causal connection must exist between the policy and the alleged constitutional deprivation.  This connection must be more than a mere 'but for' coupling between cause and effect.  To form the basis of liability under § 1983, a municipal policy must be affirmatively linked to the constitutional violation and be the moving force behind it." *Fraire v. City of Arlington*, 957 F.2d 1268, 1281 (5th Cir. 1992).

46

Officer Carbonneau's decision to draw his weapon while trying to subdue Escobar—not his decision to detain Escobar—caused Escobar's death.  Officer Carbonneau drew his service weapon during a hand-to-hand struggle with a suspect.  In the struggle, Carbonneau pointed the gun at Escobar's head.   According to Carbonneau and one eyewitness, during the struggle, Carbonneau's hand or arm was struck, which caused his weapon to discharge.  The HPD internal affairs division concluded that by drawing the weapon in close proximity with an aggressive individual, Carbonneau violated department policy.  The record evidence does not raise a fact issue as to whether the initial detention was anything more than a "but-for" cause of Escobar's death.   The evidence shows that Carbonneau's decision to draw his service weapon while struggling with Escobar was the "moving force" behind Escobar's death.  The City's summary judgment motion is granted as to the plaintiffs' theory of municipal liability based on a policy of allowing or condoning illegal detention.

The plaintiffs also argue that HPD has a policy of allowing its officers to frisk an individual for weapons and contraband without probable cause to arrest.  The plaintiffs point to an outline of a lesson plan from HPD's police academy as evidence that HPD has a policy of permitting unconstitutional frisks.  (Docket Entry No. 95, Ex. 23).  The lesson plan provides:

> I.    Searching of Prisoners (Covered in General Orders, Section 500-1)
>
> A.    "Prisoners will be searched at the time of arrest and by each cadet/officer in the chain of custody.

> Whenever possible, searches will be performed by
> a cadet/officer of the same sex as the prisoner."

II.     Types of Searches

    A.     Frisk (pat down).  Explain Terry vs. Ohio

        1.     The decision to arrest has not been made
however there is reason to believe the
suspect may be armed *or concealing
contraband.*

(*Id.* (emphasis added)).  Officer Carbonneau testified that he was taught to search for

weapons and contraband to "[s]ecure the scene, to make sure [suspects] don't have any

weapons and contraband when you're talking to them, for your safety."  (Docket Entry No.

95, Ex. 6 at 171:21–23).  Carbonneau stated that because Escobar refused commands and put

his hands near his waistband, "I decided that I was going to have to go ahead and handcuff

[Escobar] and pat him down to make sure that he didn't have any weapons."  (Def. Ex. 4 at

2336).

Limited pat-down searches for weapons are permissible "for the protection of the

police officer, where he has reason to believe that he is dealing with an armed and dangerous

individual, regardless of whether he has probable cause to arrest the individual for a crime."

*Terry*, 392 U.S. at 27; *see also United States v. Reyes*, 349 F.3d 219, 224 (5th Cir. 2003);

*United States v. Sink*, 586 F.2d 1041, 1047–48 (5th Cir. 1978).  There is no *Terry* violation

"if the searching officer can point to specific and articulable facts suggesting actual physical

risk to himself or others."  *United States v. Jenson*, 462 F.3d 399, 407 (5th Cir. 2006) (citing

*Sink*, 586 F.2d at 1048).  A police officer who has legitimately detained an individual may

48

perform a limited search of the outer clothing to discover weapons, but only if the police officer "observes unusual conduct which leads him to reasonably conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous." *Terry*, 392 U.S. at 30.  The scope of such a search is limited to that necessary to discover weapons that might be used to harm the officer or others nearby.  *Id.* at 25–26.  "Nothing in *Terry* can be understood to allow . . . any search whatever for anything but weapons." *Williams v. Kaufman County*, 352 F.3d 994, 1004 n.25 (5th Cir. 2003) (citing *Ybarra v. Illinois*, 444 U.S. 85, 93–94 (1979)).

The plaintiffs cannot maintain a municipal liability claim based on an illegal frisk policy because they have failed to raise a fact issue that such a policy existed.  The relevant evidence in the summary judgment record consists of an HPD police academy training lesson plan outline stating that under *Terry*, officers may frisk suspects for weapons *and contraband* if they have reasonable suspicion that the individual may be armed.  The outline misstates what constitutes a permissible frisk under *Terry*.  Based on reasonable suspicion, officers may frisk a suspect for weapons and if during the patdown, the officer detects an item concealed on the suspect's person that the officer has probable cause to believe is contraband, the officer may seize that item.  *See Minnesota v. Dickerson*, 508 U.S. 366, 373–78 (1993).  The outline does not clarify that the search for contraband is allowed only if in the patdown, the officer by "plain touch" forms probable cause to believe the item is contraband, and in that regard, is incorrect.  The City has produced evidence, however, that it correctly teaches *Dickerson*.  (Def. Ex. 10).  The evidence is in the form of a handout

49

entitled "Minnesota v. Dickerson, 113 S. Ct. 2130 (1993), Allowing Seizure of Contraband

During Legal Pat-Down Searches." (*Id.*).  After reciting the facts of *Dickerson*, the handout

explains the holding and its implication for police officers:

> *Dickerson* is an important case for law enforcement officers because it clarifies that an Officer can establish probable cause by the sense of touch during a *Terry* frisk.  Although the seizure was held invalid in this case, officers conducting lawful pat-down searches must, through training, experience, and other surrounding circumstances, establish probable cause that a defendant is carrying contraband, such as drugs.

(*Id.*).

HPD's then-Acting Chief of Police, Joe Breshears, states that HPD officers are trained

on the applicable standards governing search and seizure law:

> Houston Police Officers and cadets are adequately train[ed] in Fourth Amendment law.  Officer[s] are taught the concepts of reasonable suspicion for detention and probable cause for arrest. In fact prosecutors from the Harris County District Attorney's Office teach these concepts at the Houston Police Academy.  In addition, Officers are taught the principles of a frisk based upon reasonable suspicion.  Officers are also taught the concept of "plain touch" in relation to contraband.

(Def. Ex. 18 at 3).

Chief Bradford gave a consistent statement:

> All Houston Police Cadets are taught the concepts of reasonable suspicion for detention and probable cause for arrest.  In fact the Department usually has Assistant Harris County District Attorneys teach these concepts to Cadets.  Furthermore, while I was Chief of Police I was unaware of a pattern of case dismissals by either the Harris County, Fort Bend County, or Montgomery County District Attorneys' Offices which indicate that HPD Officers are poorly trained in Fourth Amendment procedures including probable cause and reasonable suspicion.

> Furthermore, as Chief of Police I was closely involved in the Department's Positive Interaction Program (PIP). Under this program I met with community leaders and civic groups to discuss police performance. This program did not present to me a pattern of complaints or evidence that our officers were inadequately trained in Fourth Amendment Procedures.

(Def. Ex. 17 at 2).

Moreover, the evidence does not raise a fact issue as to an unconstitutional frisk. Evidence in the record shows that Escobar walked away from Officer Carbonneau despite a command to remain. Carbonneau saw Escobar's hands move to his waistband, which Carbonneau took as an indication that Escobar might be reaching for a weapon. The evidence of Escobar's evasive and belligerent behavior and his presence at the apartment support the City's argument that Carbonneau had a reasonable suspicion that Escobar was involved in or had information about the assault on Matthew Rodriguez. The evidence that Carbonneau saw Escobar placing his hands in and around his waistband supports the argument that Carbonneau had a reasonable basis to conduct a brief and limited search to ensure that Escobar was not armed. *See Adams v. Williams*, 407 U.S. 143, 146 (1972) ("When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, he may conduct a limited protective search for concealed weapons. The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence . . . ." (citing *Terry*, 392 U.S. at 24)). Officer Carbonneau stated that he intended to frisk Escobar for weapons (not contraband). Importantly, no frisk or other search occurred.

51

Moreover, the plaintiffs have failed to raise a fact issue as to whether any attempt to search Escobar was a "moving force" in causing his death.  As discussed above, it was Carbonneau's decision to draw his service revolver and point it at Escobar's head – without taking steps to avoid touching the trigger – that caused Escobar's death.    The City's summary judgment motion is granted as to the plaintiffs' claim of municipal liability based on unlawful search and detention policies.

**V.      The Claim of Municipal Liability for Failure to Train**

The plaintiffs also allege that the City inadequately trained its police officers and cadets in the use of force and in weapons handling.  The plaintiffs identify four ways in which HPD's training was inadequate: HPD did not properly train cadets and officers to "index" their weapons; HPD graduated from the police academy cadets who failed the stress course without requiring remedial training; HPD eliminated its tactical training village; and HPD provided its officers inadequate gun-handling training.

A police officer's use of force violates the Fourth Amendment if the force causes injury, the force is clearly excessive to the need, and the excessiveness of the force is objectively unreasonable. *Heitschmidt v. City of Houston*, 161 F.3d 834, 839 (5th Cir. 1998). The Supreme Court has stated that "all claims that law enforcement officials have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than a 'substantive due process' approach." *Graham v. Connor*, 490 U.S. 386, 395 (1989).  "While it is not always clear just when minimal police

interference becomes a seizure, there can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." *Tennessee v. Garner*, 471 U.S. 1, 7 (1985). The plaintiffs' section 1983 claim for the use of deadly force is analyzed under the Fourth Amendment. *See Stroik v. Ponseti*, 35 F.3d 155, 157 (5th Cir. 1994), *cert. denied*, 514 U.S. 1064 (1995).

The claim for the use of excessive force under the Fourth Amendment requires the plaintiffs to show that Escobar (1) suffered an injury that (2) resulted from force that was clearly excessive to the need for force, (3) the excessiveness of which was objectively unreasonable. *Heitschmidt*, 161 F.3d at 839. "As in other Fourth Amendment contexts . . . the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397 (internal citations omitted). "It is objectively unreasonable to use deadly force 'unless it is necessary to prevent a suspect's escape and the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others.'" *Flores v. City of Palacios*, 381 F.3d 391, 399 (5th Cir. 2004) (quoting *Garner*, 471 U.S. at 3). The City does not dispute that Officer Carbonneau's use of deadly force was excessive under the circumstances and objectively unreasonable or that Escobar's death resulted from the force. The constitutional violation requirement is met.

For a municipality to be liable for failure to train, "the focus must be on the adequacy of the training program in relation to the tasks the particular officers must perform." *Snyder*,

142 F.3d at 798 (quoting *City of Canton*, 489 U.S. at 390–91).  An adequate training program

must "enable officers to respond properly to the usual and recurring situations with which

they must deal." *City of Canton*, 489 U.S. at 391.  In this inquiry, proof that the injury could

have been prevented if the officer had received better or additional training cannot, without

more, support liability.  *Snyder*, 142 F.3d at 798.  "That a particular officer may be

unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's

shortcomings may have resulted from factors other than a faulty training program. . . . It may

be, for example, that an otherwise sound program has occasionally been negligently

administered." *City of Canton*, 489 U.S. at 390–91.  In addition, for liability to attach based

on an "inadequate training" claim, a plaintiff must allege with specificity how a particular

training program is defective. *See Benavides v. County of Wilson*, 955 F.2d 968, 973 (5th

Cir. 1992).

### A.    The Evidence of Inadequate Training

The plaintiffs argue that HPD's weapons training was inadequate because it gave

improper and insufficient instruction on "indexing."  Indexing is the technique by which

officers hold a hand gun safely by keeping the trigger finger outside the trigger guard unless

and until the officer decides to shoot.  Proper indexing requires the officer to hold the

weapon with the index finger straight out, flush against and parallel with the gun barrel.

(Docket Entry No. 95, Ex. 47 at 12).  The plaintiffs' expert, David Klinger, stated that under

national policing standards, a peace officer is to keep his fingers "indexed" until the officer

has decided to shoot his gun.  (*Id.*).  Klinger cites to training manuals and policies produced

by the International Association of Chiefs of Police (IACP), the Federal Bureau of Investigation (FBI), and the National Rifle Association (NRA) Law Enforcement Activities Division as providing model policies.  The NRA's Core Safety Rules include the following instruction on indexing:

> Trigger Finger: Always keep your trigger finger straight on the frame of the gun unless the muzzle is pointed at something you are prepared to shoot.
>
> The trigger finger is only placed into the trigger guard and on the trigger when coming on target just before firing.  When not firing, place your trigger finger straight on the frame.  If the trigger finger is held just outside the trigger guard, rather than on the frame, a Convulsive Hand Grip could cause the trigger finger to fire the gun.

(Docket Entry No. 95, Ex. 47, Attachment N).

In a handout entitled, "Handgun Handling Techniques," the NRA provides a four-step process for safely drawing a weapon out of its holster.  (Docket Entry No. 95, Ex. 47, Attachment M at 3).  In the first step, the shooter is instructed to grip the weapon in the holster and release the strap keeping the gun in place.  "The trigger finger is placed straight on the outside of the holster." (*Id.*).  The second step provides instruction on drawing the weapon smoothly from the holster.  The third details the placement of the shooting hand and the support hand on the weapon as it is brought to the front of the shooter's body.  The fourth step states that "[t]he handgun is LOCKED into a <u>Ready Position</u> or <u>Firing Position</u> depending on the situation.  The trigger finger is outside of the trigger guard and held straight along the frame." (*Id.* at 4).

The same handout defines the "ready position" as appropriate when the officer has determined that he may need to use his handgun but there is no immediate discernible threat, or when an immediate threat is over or the officer is relatively certain it is over.  (*Id.* at 9). An officer holding a gun in the "ready position" has the gun in a two-hand grip in front of the officer's waist, with the muzzle pointed at a 45-degree angle toward the ground.  The NRA further instructs that in the ready position, "[t]he trigger finger is out of the trigger guard and maintained straight along the frame."  (*Id.*).  Klinger states that the "ready position" is meant to be a safe position, with the gun pointed to the ground and the trigger finger outside the trigger guard, so the gun will not discharge if "the officer trips, is startled, is jolted in any way, or has a stress contractile reaction."  (Docket Entry No. 95, Ex. 47 at 12).

In support of their theory that HPD improperly teaches "indexing," the plaintiffs point to an HPD police academy training document entitled, "Introduction to the Semi-Automatic Pistol: Range Rules and Procedures."  (Docket Entry No. 95, Ex. 20).  The document lists eight safety rules for the range.  Number six on the list states, "Keep your finger out of the trigger guard until in the ready position."  (*Id.*).  According to the plaintiffs, this instruction is contrary to the national standard because by telling officers to keep their trigger finger outside the trigger guard *until* they are in the ready position, it allows officers to place their trigger finger inside the trigger guard once they assume the ready position but *before* they have made a decision to fire.  As a result, it is clearly foreseeable that an officer can be tripped or jostled, causing the weapon to fire, even if the officer has not decided to fire.

56

The plaintiffs point to the testimony of Officer Conley, HPD's police academy firearm's trainer, in support of their argument that the HPD training was inadequate to avoid a clearly foreseeable risk of injuring others. Officer Conley testified as follows:

> Q:   What are you taught with regard to indexing in the academy? When I say "indexing," we're talking about what? What is indexing about?
>
> A:   "Indexing" means your finger is outside the trigger guard. That way, it will prevent you from accidentally pulling a trigger, if you stumble, if you fall, if you move, if somebody grabs your gun or strikes your weapon.
>
> Q:   Okay. And at what point do you stop indexing?
>
> A:   When you believe there is an immediate threat, your perception is that there is an immediate threat.
>
> Q:   And you make a conscious decision to shoot?
>
> A:   Well, not necessarily, no.
>
> Q:   Okay. So when you say there's an immediate threat. To who?
>
> A:   To the officer or a third party.

(Docket Entry No. 95, Ex. 10 at 128:25–129:18). The plaintiffs argue that, according to Officer Conley's testimony, HPD trains its officers to put their trigger finger inside the trigger guard before the decision to shoot is made, in contrast to prevailing standards, and in the face of an obvious risk created by such training.

The plaintiffs also argue that HPD did not have a program to ensure that its cadets and officers develop good indexing habits. Klinger stated that it is well known that officers do not gain proficiency in indexing naturally. As with other gun-handling and similar skills,

repeated training is required to develop the skill and to be sure it is used in stressful situations that are likely to be present when an officer feels compelled to draw his weapon.  In such stressful situations, it is imperative that the officer refer to his or her training and that the training be so familiar as to be instinctive.  The officer's weapons-handling should be part of his "muscle memory."  (Docket Entry No. 95, Ex. 47 at 16).  Klinger opined that without a program in place to ensure indexing proficiency, HPD's training was inadequate.  Albert Rodriguez, HPD's expert on officer training, states that approximately 3,000 repetitions are required to achieve muscle memory of a given skill.  (Docket Entry No. 95, Ex. 19 at 86:4–10).  At the HPD academy, cadets were required to draw their weapons in front of their instructors 5 times each on 10 qualification courses, for a total of 50 repetitions.  (Docket Entry No. 95, Ex. 9 at 38:1–40:4).

The City responds that the rules of the firing range and Officer Conley's testimony do not show that HPD improperly taught indexing.  The City submits an affidavit from Acting Chief Breshears stating that HPD's police academy teaches its cadets to keep their finger on the trigger guard and not on the trigger itself before making a decision to shoot. (Def. Ex. 18 at 3).  Chief C.O. Bradford also stated that the HPD academy taught indexing during his tenure as Chief of Police.  (Def. Ex. 17 at 2).  Officers Conley and Bratton, both training officers within HPD's training division, stated that during a cadet's training, the training officers "specifically look to see if the cadet properly handles his/her weapon, including keeping his/her finger outside of the trigger guard when first unholstering a pistol. . . . [A]nytime the cadet is observed violating the principles of indexing, the cadet is

immediately corrected and instructed on the proper application of those principles." (Def. Ex. 24 at 4). In their experience, Conley and Bratton have observed very few cadets who do not properly index when unholstering their weapons by the end of the academy training program. HPD's expert, Albert Rodriguez, also states that HPD officers are taught proper indexing. (Def. Ex. 11 at 16–17). HPD officer John Lambert also testified that HPD officers are taught to keep their trigger fingers outside the trigger guard unless and until the following three elements occur: (1) the officer identifies the threat or target; (2) the officer has the sight of his weapon on the threat or target; and (3) the officer is protecting himself or another person from imminent death or serious bodily injury. (Def. Ex. 32 at 3).

The plaintiffs also argue that the training program was inadequate because HPD had a policy of graduating cadets from the police academy who had not passed the "stress-fire course" training program. (Docket Entry No. 95 at 30–32). The stress-fire course is part of the Tactical Firearms Training Program. The course requires officers to run through a course, find cover, draw their weapons, and fire a series of rounds at various targets. During the exercise, lights and sirens are blared to provide confusion and distraction. (Docket Entry No. 92, Ex. 8 at 89:23–91:22). Klinger stated that the stress-fire course provided cadets the "best opportunity to appropriately use their firearms during encounters with citizens." (Docket Entry No. 95, Ex. 47 at 13). According to the HPD's Cadet Code of Conduct, a cadet must satisfactorily complete all phases of the Tactical Firearms Training Program, including the stress-fire course and other tactical courses, with a total score of at least seventy percent to graduate. The grading system allotted five percent of a cadet's total score on the

tactical program to the stress-fire course.  However, cadets did not have to pass the course to graduate and those who failed did not have to take remedial training.  (Docket Entry No. 95, Ex. 21).

According to Officer Bratton, the stress-fire course is not required by the Texas Commission on Law Enforcement Officer Standards and Education (TCLEOSE).  (Def. Ex. 39 at 3).  Bratton stated that there is no State of Texas requirement that a cadet receive a passing score on the course.  According to Bratton, the stress-fire course is not relevant to the situation Officer Carbonneau faced in this case.  Bratton stated that the stress-fire course is intended to train cadets to acquire and strike targets rather than to train on how to decide whether to shoot.  The training courses relevant to the issues in this case, according to Bratton, are those devoted to defensive tactics.  Bratton stated that HPD required all its cadets to pass courses teaching defensive tactics and how to "disengage" to create space between an officer and a suspect before drawing a weapon.  (*Id.*).  The City's expert, Albert Rodriguez, stated that the HPD police academy has continuously met the TCLEOSE requirements.  (Def. Ex. 11 at 9).

HPD Senior Officer Terry Wolfe, an instructor at the training academy, stated that all HPD cadets who graduate meet the training required by TCLEOSE.  (Def. Ex. 25 at 2).  The TCLEOSE standards require each officer to pass the following courses relevant to the situation Officer Carbonneau faced: arrest, search, and seizure; U.S. Constitution and Bill of Rights; Use of Force-Concepts; Professional Police Approaches; Strategies of Defense-Firearms; Strategies of Defense-Mechanics of Arrest; Recognizing and Interacting with

60

Persons with Mental Illness and Retardation; Professionalism and Ethics; Code of Criminal Procedure; Penal Code; and Use of Force-Law. (Def. Ex. 11 at 11). Officer Carbonneau also took an Intermediate Use of Force course, which exceeded TCLEOSE requirements. (*Id.* at 13). That course covered command presence, verbal tactics, empty-hand or weaponless control, chemical/electrical means, baton or impact weapons, and deadly force. Each HPD cadet receives a minimum of 80 hours of instruction in defensive-tactics training, which is intended to help officers maintain control in different situations. Such techniques include deciding when to use force and how much is necessary. "Force option enables the officer to select and apply only the level of force necessary to maintain officer and citizen safety." (Def. Ex. 25 at 2). Officers are trained in hand-to-hand combat, grappling, handcuffing, and the use of batons and pepper spray. Officer Wolfe stated that officers are taught to use only the amount of force necessary to effect an arrest or protect themselves or others. "At no time are officers and cadets taught to go hands on with a firearm in their hands. HPD training stresses to holster and secure your firearm before you go hands on with a suspect and to follow force option training." (*Id.* at 3).

The plaintiffs also argue that the City's decision to eliminate the officers' tactical training unit known as "Hogan's Alley," is further evidence that the weapons training was inadequate. Hogan's Alley served as a training and evaluation venue for cadets and officers in the tactical use of firearms. Klinger stated that Hogan's Alley-type training facilities "expose cadets and patrol officers to ongoing live-fire real-life scenario-based shoot/don't shoot training calculated to improve the officers' safe gun handling habits and performance

61

under stress and to improve 'muscle memory' relating to safe gun-handling." (Docket Entry

No. 95, Ex. 47 at 14).  The tactical training village provided instruction and training in how

to decide when to use deadly force.  (Docket Entry No. 95, Ex. 8 at 24:5–20).  Klinger stated

that "[b]y eliminating the tactical training village, HPD consciously eliminated its sole

designated venue for providing this important firearms tactical training to cadets and patrol

officers, resulting in grossly inadequate tactical training."  (Docket entry No. 95, Ex. 47 at

14).

On July 9, 2003, HPD Training Division's Officer Safety Unit, which included

Officers Conley and Bratton, wrote a letter to Chief Bradford and other administrators in the

Training Division requesting additional tactical-training capabilities.  (Def. Ex. 38).  The

letter stated in part:

> We were recently made aware, through media reports, that the
> SWAT detail is in the process of soliciting funds for the
> construction of a live-fire shooting house and non-lethal
> shooting house, and that construction is to begin soon.
>
> We, as officers assigned to the Department's Officer Safety
> Unit, respectfully request that we be allowed to provide input in
> the design and implementation of these buildings.
>
> The "Hogan's Alley," our only training area, was taken over for
> use as the qualification range.  We have no place to conduct
> hands-on officer safety/tactical training for officers.  Cadet
> demonstrations and Field Problems are conducted in Academy
> driveways and in office spaces, neither of which are suitable or
> appropriate for this type of training.
>
> . . . .
>
> As those called on to review documents and provide expert
> testimony, we want to ensure that all training provided at this

facility is consistent with the Department and Academy's standards regarding techniques and terminology. In addition, we would like to assist in developing a method of scheduling which would ensure the facility's availability for SWAT training, Officer Safety training, Cadet training, and training requested by, or deemed necessary, for any other division or unit.

(*Id.*).

Officer Bratton testified that after the "Hogan's Alley" training for "high-stress" situations was eliminated, HPD began using computer-generated simulated high-stress situations for training. (Def. Ex. 24 at 4). HPD used the computer training when Officer Carbonneau was a cadet at the academy. (Def. Ex. 39 at 2). In Bratton's opinion, the computer-generated scenarios provide training "equal to or better than the training using physical settings." (*Id.*).

The plaintiffs' fourth argument is that HPD failed to require its officers to qualify with their service weapons more than annually and even then, only required officers to maintain their shooting proficiency, not to maintain their skill in weapons-handling. The plaintiffs state that HPD's annual firearms qualification requirements address only target shooting; weapons-handling training after academy graduation is offered but not required. In a paper originally written in 1989 and revised in 1995, the IACP stated that "acceptable firearms training and evaluation are no longer limited to target practice." (Docket Entry No. 95, Ex. 47, Attachment D at 5). Rather, in addition to target proficiency, officers should annually qualify on simulated shooting situations to maintain their skills in making shooting decisions under stress and "to enhance the officer's discretion and judgment in using deadly and non-

63

deadly force." (*Id.*). The IACP also stated that "[i]t is difficult to defend a semi-annual schedule of firearms proficiency testing under contemporary professional standards. Court decisions have, in fact, cited the semi-annual qualification criteria among other factors as evidence of a grossly inadequate firearms training program." (*Id.*). The IACP suggested a minimum of quarterly qualification but advocated bimonthly qualification as a departmental goal. HPD's annual target-shooting qualification does not rate well, according to the plaintiffs.

Klinger maintained that HPD's annual-qualification requirement also falls below that of other comparable municipal police departments. According to Klinger, Los Angeles requires quarterly hand-gun (including firearms handling) qualification; New York City requires biannual qualification that includes tactical firearms training; Phoenix has a quarterly training requirement in addition to an annual qualification with specific training in real-life scenarios and tactical training. (Docket Entry No. 95, Ex. 47 at 16).

Klinger also stated that weapons-handling, including indexing, and related use-of-force decisionmaking, are perishable skills; without frequent practice, such skills are lost. Klinger opined that annual qualification would be insufficient to maintain the "muscle memory" of these tactical skills.

It is undisputed that officers frequently encounter stressful situations involving physical combat encounters like the one faced by Officers Carbonneau and Olivo on November 21, 2003. Officer Carbonneau stated that in the seventeen months between his academy graduation and Escobar's shooting, he had engaged in physical combat with a

64

suspect or other civilian "a lot of times." (Docket Entry No. 95, Ex. 6 at 165:14–166:18). The threshold question is whether there are fact issues material to determining whether the training HPD cadets and officers receive is adequate to enable them to deal with these types of situations. *See Benavides*, 955 F.2d at 973 (quoting *City of Canton*, 489 U.S. at 388).

The plaintiffs argue that HPD's computer-generated "shoot–don't shoot" training simulator is inadequate and supports the failure-to-train claim. The plaintiffs rely on the IACP model policy for firearms training. This policy does not go as far as the plaintiffs argue. This policy states that "[f]irearms training should attempt to simulate the actual environment and circumstances of foreseeable encounters in the community setting . . . . A variety of computer-simulated training devices are presently available together with established and recognized tactical, exertion, and stress courses. . . . Scrutiny of firearms training will normally include an evaluation of the relevance and utility of such instruction." (Docket Entry No. 95, Ex. 47, Attachment D at 5). In a July 9, 2003 letter, Bratton and Conley told Chief Bradford that the training division lacked a "suitable or appropriate" space to conduct "hands-on officer safety/tactical training." (Def. Ex. 38). Bratton testified that HPD's computer-generated simulation training is equivalent to or exceeds the training received in live-training courses. The July 2003 letter shows that HPD's training division wanted the ability to provide live-fire training in addition to the computer-simulated training, not that the training division found the computer-simulated training deficient.

It is also not clear from the record whether the stress-fire course training is relevant to this case. That course does not test an officer's ability to make the right decision on

whether or not fire his or her gun.  Rather, the purpose of that course is to train an officer in shooting accurately in real-life conditions.

The record does, however, raise fact issues as to whether HPD provided sufficient training for its cadets and officers on how to index their weapons to minimize the risk of accidental firings that can injure or kill.  The record evidence is inconsistent.  HPD's Range Rules state that it is acceptable to put the trigger finger on the trigger once the officer is in the "ready position," even if a decision to shoot has not been made.  Officer Conley stated that an officer may put his trigger finger on the trigger when he senses an immediate threat, again before he has made the decision to shoot.  Officer Lambert agrees.  Chief Breshears stated that HPD officers are taught to keep their finger off a gun trigger until the decision to shoot has been made.  The evidence as to prevailing national standards shows a consensus that an officer must be trained to instinctively keep the trigger finger outside the trigger guard until that officer has actually decided to fire his weapon.

Officer Carbonneau's testimony about the indexing training he received reveals his own uncertainty about the proper time to "trigger" his weapon.  Carbonneau testified at one point as follows:

> Q:     And do you recall what your training was with regard to where your trigger finger should be when you draw your service pistol?
>
> A:     Straight.
>
> Q:     Straight where?
>
> A:     On the side of the pistol.

66

Q:      Uh-huh.  And where was it on this occasion?

A:      I don't remember.

Q:      Did you receive any specific training with regard to the placement of your finger while you were in the police academy?

A:      Yeah.

(Docket Entry No. 95, Ex. 6 at 164:18–165:5).   Carbonneau also gave the following inconsistent testimony:

Q:      —this indexing, you had been taught the index at the police academy, hadn't you?

A:      Taught the index at the academy?

Q:      Yes, sir.

A:      Yeah.

Q:      They taught you how to index—I mean, they reemphasized indexing when you were in field training. Isn't that correct?

A:      I don't remember going over it in field training, sir.

Q:      You don't remember—but they told you about indexing, don't pull your weapon until you—don't put your finger on the trigger until you're ready to draw—until you're ready to shoot.  Isn't that correct?
. . . .

A:      I don't remember that sir.  I'm sorry.  You'll have to restate that question.

Q:      Okay.  Didn't they tell you—weren't you taught at the police academy not to put your finger on the trigger, keep it on the trigger guard until you're ready to shoot?
. . . .

A:      They told us a lot of things, and they said that, and then they said it another way. . . . They said is that way, then they'll say it another way.  They told you two different ways, gray areas.

Q:      Okay.  And what two different ways did they tell you?

A:      That wasn't—you knew the acquisition of the suspect or person and you were in danger, or somebody else, like I showed earlier, okay, put your finger in the trigger guard and not pull the trigger until you felt the threat was shown or you're being shot at or somebody is rushing at you, gonna stab you.

. . . .

Q:      With regard to the training that they give you . . . they taught you—did they teach you that you have to shoot when you put your finger on the trigger?

A:      No, you don't have to.

Q:      Okay.  You don't have to make that decision prior to putting your finger on the trigger, do you?

A:      That's correct.  You don't have to.

(Docket Entry No. 95, Ex. 6 at 247:18–250:19).

The NRA guidance on how to instruct officers on placing their fingers on the trigger states that the "trigger finger is <u>only</u> placed into the trigger guard and on the trigger when coming on target just before firing.  When not firing, place your trigger finger <u>straight on the frame</u>." (Docket Entry No. 95, Ex. 47, Attachment N).[6]  Klinger, the plaintiffs' expert, stated

_____

[6] The City disputes that model policies can serve as evidence of municipal liability.  The courts state that an expert's comparison of a defendant municipality's policies to national standards and model policies cannot, by itself, establish municipal liability.  *See Snyder v. Trepagnier*, 142 F.3d 791, 797 n.5 (5th Cir. 1998) (citing *Bd. of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 415–16 (1997); *Stokes v. Bullins*, 844 F.2d 269, 275 (5th Cir. 1988)); *see also Young v. City of Providence*, 404 F.3d 4, 19 (1st Cir. 2005); *Larkin v. St. Louis Hous. Auth. Dev. Corp.*, 355 F.3d 1114, 1118 (8th Cir. 2004); *Gaddis ex rel.*

that "a policy that in any way condones the placement of the finger on the trigger in the ready position is grossly inadequate, a manifest safety hazard, and a deviation from widespread law enforcement customs, practices, and standards."  (Docket Entry No. 95, Ex. 47 at 13).

The evidence shows inconsistent evidence as to HPD's training of cadets, including evidence that HPD does not adequately instruct in "indexing."  The evidence also shows that in and after the academy, HPD does not demand indexing proficiency through repetitious training designed to instill a habitual skill that will likely be remembered and used in stressful situations.  The City's expert, Albert Rodriguez, testified that approximately 3,000 repetitions of a given exercise are required to develop consistent "muscle memory."  The record evidence shows that HPD's training academy requires its cadets to draw their weapons in front of an instructor approximately 50 times.  Its officers, once graduated from the academy, are not required to draw their weapons in front of an instructor at all.  The IACP indicated that a semiannual gun qualification program is nearly "indefensible."  HPD requires only annual qualification.[7]

---

*Gaddis v. Redford Twp.*, 364 F.3d 763, 775 (6th Cir. 2004); *Cottrell v. Caldwell*, 85 F.3d 1480, 1489–92 (11th Cir. 1996); *Zuchel v. City & County of Denver*, 997 F.2d 730, 739 (10th Cir. 1993); *Russo v. City of Cincinnati*, 953 F.2d 1036, 1047 (6th Cir. 1992) ("As an initial matter, we do not believe the opinions of experts are to be given no weight by this court, as the City apparently urges.  Especially in the context of a failure to train claim, expert testimony may prove the sole avenue available to plaintiffs to call into question the adequacy of a municipality's training procedures.  To disregard expert testimony in such cases would, we believe, carry with it the danger of effectively insulating a municipality from liability for injuries resulting directly from its indifference to the rights of citizens.  Reliance on expert testimony is particularly appropriate where, as here, the conclusions rest directly upon the expert's review of materials provided by the City itself."); *Larez v. City of Los Angeles*, 946 F.2d 630, 635–36 (9th Cir. 1991).  Although such expert testimony is insufficient by itself to establish municipal liability, *see Stokes*, 844 F.2d at 275, it may nonetheless be considered.

[7]  In 2005, HPD's professional development division recommended that HPD increase its weapons qualifications requirements from once per year to semi-annually.  (Docket Entry No. 95, Ex. 37).  The development division also recommended that the semi-annual qualification include a "holster draw

There is also evidence that after an officer graduates from the academy, HPD does not require ongoing critical training or qualification in the use of defensive tactics, the use of force, when it is appropriate to unholster a weapon, and when it is appropriate to discharge a weapon.  The record shows that cities of comparable size in the United States mandate semiannual or quarterly firearms training, including tactical training.

The record evidence raises a fact issue as to whether HPD adequately trains its cadets and officers in the use of their service weapons to reduce foreseeable risks of accidental discharge.  The evidence of the difference between the HPD program and prevailing national standards inform this conclusion but do not determine it.  The evidence shows that the basis of training in "indexing" is the obvious risk that if an officer places his trigger finger inside the trigger guard, the gun may discharge if the officer is jostled, trips, or falls.  To avoid this risk, an officer must be trained not to put his trigger finger inside the trigger guard unless and until the officer has decided to shoot.  The analysis does not make national standards a measure of constitutionality, but uses the national standards as evidence to inform the analysis of whether the HPD training is unconstitutional because it does not "enable officers to respond properly to the usual and recurring situations with which they must deal."  *City of Canton*, 489 U.S. at 391.

**B.     The Evidence as to Whether Inadequate Training Caused Escobar's Death**

---

component."  Other recommendations included a mandatory quarterly training on the use of intermediate weapons and firearms.  (*Id.*).  On March 3, 2005, Chief Hurtt approved the recommendations for increased training and qualification, including that the semi-annual weapons qualification include a draw component. (Def. Ex. 62).

Officer Carbonneau testified that he was taught varying methods of indexing and that the instruction he received included "gray areas."  (Docket Entry No. 95, Ex. 6 at 247:18–250:19).  The City's own experts stated that Carbonneau likely improperly indexed his weapon by placing his trigger finger on the trigger when he drew the gun from its holster.  The City's experts opined that a convulsive hand movement likely caused Carbonneau to discharge his gun.  Albert Rodriguez attributed the discharge to either a sympathetic reflex or a startled response.  (Def. Ex. 11 at 8).  HPD Officer Edwin Lem stated that the weapon Officer Carbonneau carried, a Glock service pistol, has a built-in safety mechanisms to prevent the gun from accidentally discharging if it is dropped.  (Docket Entry No. 95, Ex. 9 at 128:20–131:5).  According to Lem, a Glock will not discharge unless the trigger is pulled.  (*Id.*).  Officer John Lambert confirmed that a Glock pistol will not discharge unless the trigger is "depressed to the rear."  (Def. Ex. 32 at 4).  Carbonneau also testified that although he drew his weapon while struggling with Escobar, he did not intend to shoot.  Instead, Carbonneau planned to back away and give Escobar verbal commands.  Carrboneau nonetheless had his index finger on the trigger.  (Docket Entry No. 95, Ex. 6 at 162:19–163:7).

The record shows that Officer Carbonneau graduated from the HPD police academy on June 14, 2002.  The shooting occurred on November 21, 2003, seventeen months later. After graduating from the academy, HPD officers are required to complete Probationary Officer Field Training, in which they accompany Field Training Officers who evaluate and supervise their actions.  Carbonneau received Probationary Officer Field Training for over

71

eleven months.  (Def. Ex. 11 at 19).  Officer Carbonneau passed the Probationary Officer Field Training.  He received deficiency marks for his involvement in two automobile accidents.  (*Id.*).  There is no indication, however, that this Field Training included instruction on use-of-force techniques or defensive tactics.  Carbonneau did not receive training or have to qualify on weapons use or defensive tactics after he graduated from the academy.

The City contends that Officer Carbonneau failed to use the defensive tactics he received.  The City acknowledges that Carbonneau used poor judgment in unholstering and drawing his service weapon in close proximity to Escobar and in having his finger on the trigger.  There are disputed fact issues as to whether Carbonneau received training adequate to give him the skills necessary to deal with the close-combat situation he faced without seriously injuring or killing others.  If Officer Carbonneau was not given consistent and effective instruction on when to place his trigger finger on the trigger, regardless of whether he failed to exercise sound judgment in drawing the weapon, there was an evident risk that a blow to his arm or hand would cause the weapon to discharge even if the officer had not decided to shoot.  The evidence supports an inference that the failure to give Officer Carbonneau adequate training in indexing his weapon caused him to shoot Escobar.

Certainly, as the City states, no amount of training can eliminate the possibility of an accident.  Nor can any amount of indexing training ensure that an officer will "index" his weapon properly each time it is drawn.  There are disputed issues, however, as to whether HPD adequately trained officers in safe-weapons handling.  The evidence raises fact issues

72

as to whether Officer Carbonneau had been properly instructed and trained on indexing his weapon before a decision to shoot was made.  The evidence shows that Officer Carbonneau was not required to take additional training on indexing and related gun-safety issues in the seventeen months after he graduated from the academy.  The evidence raises fact issues as to whether this training was inadequate and was a cause of Escobar's death.

### C.   The Evidence as to the City's Deliberate Indifference

HPD policy requires the Chief of Police to approve the training programs offered at the police academy and by the training division.   (Docket Entry No. 95, Ex. 11 at 48:9–49:20).  On February 28, 2002, HPD Chief Bradford wrote a memo to Marty Stein, the Agenda Director for the Houston Mayor's Office, responding to a request for information about HPD's use of deadly force and the department's handling of police calls involving mentally ill individuals.  (Def. Ex. 16).  Stein had asked Bradford to provide this information in response to a group of concerned citizens who appeared at a February 19, 2002 Houston City Council meeting.   At the meeting several members of the Houston community, including Annette Lamoreaux, the East Texas Regional Director of the American Civil Liberties Union, raised concerns about several recent officer-involved shootings.  (Docket Entry No. 95, Ex. 30 at 9).  Lamoreaux told City Council that HPD had the second-highest per capita number of shootings during violent arrests in the United States.  Lamoreaux asked City Council to provide a Citizen Review Council access to HPD's internal affairs investigation documents so the Review Council could further investigate HPD's findings. Other citizens appeared to provide their personal stories about police shootings.

In response to Stein's request after this meeting, Bradford wrote:

> Regarding the use of deadly force, all Houston Police Department employees are directed to use the minimum amount of force needed to protect themselves or others, make arrests, and maintain custody of those arrested, even if the law would allow the use of greater force. All employees are further directed that the use of deadly force is limited to those circumstances in which employees reasonably believe it is necessary to protect themselves or others from the imminent threat of serious bodily injury or death. To address the issue of officers responding to disturbances involving mentally ill persons, the department implemented the below-described Crisis Intervention Team Program in July 1999 and the De-escalation Training course in 2000.
> . . . .
>
> In addition to the CIT program, in 2000 all Houston police officers attended an 8-hour De-escalation Course, which is based on the CIT program. Police Department personnel, an outside private psychiatrist, and members of the Mental Health Association of Greater Houston designed the De-escalation Course. All new police cadets are required to attend this course. Staff members of the Houston Police Academy also teach this course to officers from other law enforcement agencies.

(Def. Ex. 16).

In a December 12, 2001 memo to Chief Bradford, Sergeant Lem conveyed his belief that HPD should offer more firearms training. (Docket Entry No. 101, Ex. 48A). Lem wrote the memo after attending a voluntary in-service course at HPD's training unit. Lem commended the HPD training division on the firearms-training course and told Chief Bradford of other attendees' comments that "classes like this should be mandatory" and "the Department needs more classes like this." (*Id.*). However, Officer Conley believed that the defensive tactics training, firearms training, and officer safety training provided at the

Houston Police Academy were among the best in the country.  (Docket Entry No. 95, Ex. 10 at 132:20–133:6).

Chief Bradford also received a letter on July 9, 2003 from Officers Conley and Bratton about a new tactical training village.  (Def. Ex. 38).  In the letter, Conley and Bratton stated that the training division lacked a suitable venue for instructing cadets and officers on "hands-on officer safety/tactical training."  (*Id.*).  Although Bratton testified in this suit that the computer-simulated training was effective and in some regards exceeded the quality of training an officer could receive in live-fire scenarios, the July 2003 memo to Bradford indicates that more tactical training facilities were needed.

Stronger evidence of HPD's knowledge of inadequate officer training in indexing and other techniques to avoid accidental firings in situations involving encounters with civilians is found in the "Noteworthies" used to record gun discharges.  HPD creates a "Noteworthy Event" memorandum each time an officer discharges his weapon.  The "Noteworthies" are sent to Chief Bradford and other HPD administrators.  The plaintiffs' expert, Klinger, reviewed the "Noteworthies" and emphasized that they informed HPD policymakers that HPD officers accidentally discharged their weapons during citizen encounters in which at least one citizen was at risk of serious injury or death twenty-six times in the five years leading up to Escobar's death.  (Docket Entry No. 136, Ex. 50).  In each of these twenty-six cases, HPD's internal affairs division concluded that the shootings were accidental and caused by the officer's poor handling of his weapon.

The City argues that of the twenty-six accidental discharges, only six can be attributed to gun-handling error, which may include improper indexing.  Albert Rodriguez, the City's expert, attributed the other twenty incidents to such factors as loss of balance, startled response, and sympathetic reflex.  Rodriguez explained:

> Some of the variables might include but [are] not limited to something or some tangible item besides the officer's finger possibly striking the trigger causing the discharge and/or a combination of Sympathetic Reflex, Startled Response, Loss of Balance, and/or Officer Gun Handling Error that is not articulated in the case investigation. . . . Regardless of where the index finger is placed, if a trained and/or untrained person is making a fist with one hand (such as grabbing or punching a suspect) the other hand wants to mirror that particular action, thus a fist on the opposite hand might be made without the person conscious that it is occurring (Sympathetic Reflex).  If the same person is startled, i.e. auditory stimuli, it is highly probable that the skeletal and/or the muscular system will contract as a reaction, thus the hand again is configured into a fist (Startled Response).  The same holds true, if a person loses his/her footing and is about to fall.  The tendency is to reach out and grab with the hands to maintain balance, thus the hand again is configured into a fist (Loss of Balance).  The analysis of the aforementioned unintentional firearms discharge incidents clearly indicate that the majority of the unintentional discharges were as a result of Sympathetic Reflex, Startled Response, or Loss of Balance.  For the most part, these types of unintentional discharges cannot be prevented.

((Def. Ex. 58 at 7–8).

Klinger responded by stating that proper indexing prevents a gun from discharging if "the officer trips, is startled, is jolted in any way, or has a stress contractile reaction." (Docket Entry No. 95, Ex. 47 at 12).  The record creates a fact issue on the City's knowledge

of the risk created by inadequate training on indexing.  The "Noteworthies" support the
existence of a fact issue on deliberate indifference.

The Noteworthies describe incidents sufficiently similar to the Escobar shooting to
support a finding of deliberate indifference.  In one incident on February 22, 1999, an officer
was chasing a suspect with his weapon drawn.  The officer grabbed the suspect with one
hand while holding his weapon in the other. The gun discharged.  (Def. Ex. 65-26).  On June
18, 1999, an officer was chasing a car.  When it stopped in traffic, the officer struck the rear
driver's side window with his weapon.  As the officer struck the window, his gun discharged,
injuring the driver.  (Def. Ex. 65-25).  On July 1, 1999, an officer unholstered his pistol while
chasing a suspect.  The suspect grabbed the officer's shirt during a struggle, causing the
officer to lose his balance.  His weapon discharged.  (Def. Ex. 65-23).  On August 23, 1999,
an officer approached a suspect with his service weapon drawn.  The suspect reacted by
lunging toward the officer.  In response, the officer pushed the suspect away with both hands.
His weapon discharged into the suspect's face and shoulder.  (Def. Ex. 65-17).  On
November 18, 1999, an officer executing a search warrant accidentally discharged his
weapon when he switched the gun from one hand to the other.  The officer was holding his
weapon at his side in the "ready position" when it discharged.  (Def. Ex. 65-18).  On
February 14, 2000, an off-duty officer was attacked by a man with a baseball bat.  The officer
ran to his truck to get his pistol and call for help.  While on the phone, the officer held his
pistol in his right hand.  When the attacker yelled, "I'm going to kill you," the officer was
startled and accidentally fired the gun.  (Def. Ex. 65-20).  On February 18, 2000, an officer

pulled over an intoxicated driver.  The officer approached the car with his weapon drawn, ordering the suspect out of the car.  As the suspect opened the car door, the door struck the officer's hand, causing the gun to discharge.  (Def. Ex. 65-15).  A similar incident occurred on November 22, 2000.  (Def. Ex. 65-14).  On April 12, 2001, several officers surrounded a suspect's car with their guns drawn.  As one officer moved closer to the driver's window to break the glass, switching his gun from his right hand to his left, he slipped and his gun discharged.  (Def. Ex. 65-12).  On September 9, 2001, an officer approached a suspect's vehicle in a parking lot and ordered the suspect to get out of the car.  While standing outside the car, the suspect leaned into the car through an open window.  The officer reached out to grab the suspect to prevent him from obtaining a weapon from inside the car.  As he pulled the suspect from the car, they both lost their balance, falling to the ground.  The gun discharged as the officer and suspect hit the ground.  (Def. Ex. 65-11).  On November 1, 2001, an officer pursued a suspect on foot, tripping twice and accidentally discharging his weapon both times.  (Def. Ex. 65-10).  On May 4, 2002, an officer placed his flashlight inside a suspect's vehicle while holding his service weapon in his other hand.  The suspect grabbed the officer by the arm and accelerated, dragging the officer.  The officer's weapon discharged.  (Def. Ex. 65-9).  On September 18, 2003, an officer approached a suspect, identifying himself as a police officer.  The suspect quickly swallowed the rock of cocaine he was holding and fled.  The officer gave chase with his weapon drawn.  When the officer caught up with the suspect, the two struggled.  The suspect swung his arm and struck the officer's gun hand, causing the weapon to discharge.  The bullet struck the brim of the

officer's hat.  (Def. Ex. 65-2).  Finally, on October 31, 2003, an officer chased a fleeing

suspect's car.  The officer followed a short distance behind the suspect and, when the suspect

was stopped in traffic, the officer left his vehicle and approached the suspect's vehicle with

weapon drawn.  The officer ordered the suspect out of the car, pointing his pistol through the

driver's window at the suspect's head.  The suspect accelerated, bumping the officer's hand.

The gun discharged.  The suspect was shot in the head and died in the ambulance on the way

to the hospital.  (Def. Ex. 65-1).  The other Noteworthies present similar factual situations

involving accidental discharges.

The Noteworthy incidents raise a fact issue as to whether there is a pattern of weapons

mishandling by HPD officers, particularly involving a failure to use weapons-handling

techniques—including indexing—intended to prevent accidental discharges.  In *Pineda v.

City of Houston*, 291 F.3d 325 (5th Cir. 2002), the Fifth Circuit held that evidence of eleven

incidents of warrantless searches of residences by the City's gang task force unit did not

show an unwritten custom or practice of unconstitutional warrantless searches.  The court

determined that the eleven incidents were not sufficiently similar to the facts at issue to

constitute a pattern.  Several of the warrantless searches were clearly justified by the consent

of the owner of the home or by exigent circumstances and were not unconstitutional.  *Id.* at

329.  The pattern evidence here is not presented to show the existence of a custom or

practice, but rather to show the City's knowledge of the need for additional training in

firearms handling, especially indexing.  Moreover, the facts described in the Noteworthies

are "fairly similar to what ultimately transpired."  *Estate of Davis*, 406 F.3d at 383.  There

is a fact issue as to whether the City faced and ignored a pattern of similar incidents.[8]

The City argues that its training requirements met and in some respects exceeded the

standards set by the State of Texas.  *See D.T. v. Indep. Sch. Dist. No. 16*, 894 F.2d 1176,

1179, 1193–94 (10th Cir.), *cert. denied*, 498 U.S. 879 (1990) (municipality not deliberately

indifferent when policymaker relied on state certification to insure that teacher lacked

criminal record).  Meeting the State's standard, however, does not equate to a finding that

as a matter of law, there is no constitutional violation.  *See Benavides*, 955 F.2d at 973

(requiring the plaintiff to show that, although defendant's training met state standards, "this

legal minimum of training was inadequate to enable the deputies to deal with 'usual and

recurring situations' faced by jailers and peace officers"); *see also Long v. County of Los*

---

[8]  The plaintiffs argue that proof of a pattern of similar incidents is unnecessary given the evidence that the City's policymakers knew of the type of training offered at HPD and approved of such training.  The single-incident exception to the deliberate indifference requirement is narrow.  *See Estate of Davis*, 406 F.3d at 385–86.  "To rely on this exception, a plaintiff must prove that the 'highly predictable' consequence of a failure to train would result in the specific injury suffered, and that the failure to train represented the 'moving force' behind the constitutional violation." *Roberts*, 397 F.3d at 295 (quoting *Brown*, 219 F.3d at 461).  A municipality may be held liable only for "acts which the municipality has officially sanctioned or ordered." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986)).  A municipality can incur liability based upon the isolated actions or decisions of municipal officials only if such an official possesses "final policymaking authority." *Id.* (quoting *Pembaur*, 475 U.S. at 483).  Finally, "the challenged action must have been taken pursuant to a policy adopted by the official or officials responsible under state law for making policy in that area of the city's business." *Id.*  The Fifth Circuit has expressed reluctance to sustain a section 1983 claim based on a single incident and the opinion of an expert. *See Conner v. Travis County*, 209 F.3d 794, 797 (5th Cir. 2000); *Synder v. Trepagnier*, 142 F.3d 791, 796–97 (5th Cir. 1998).

Violations of criminal law are the typical circumstance in which liability is permitted under *Pembaur*. *See Bennett v. Pippin*, 74 F.3d 578, 586 (5th Cir. 1996) (finding municipal liability under single-incident exception when sheriff allegedly raped plaintiff); *Turner v. Upton County*, 915 F.2d 133, 137 (5th Cir. 1990) (finding municipal liability under single-incident exception when sheriff and district attorney allegedly conspired to subject plaintiff to trial on false charges based on fabricated evidence).  The case law does not support a finding of municipal liability based on the single-incident exception in this case.

*Angeles*, 442 F.3d 1178, 1188 (9th Cir. 2006) (holding that hiring trained medical professionals at the county jails does not as a matter of law insulate the County from municipal liability); *Hogan v. City of Easton*, No. 04-759, 2006 WL 3702637, at *12–13 (E.D. Pa. Dec. 12, 2006) ("The City Defendants do not cite—and the Court has not located—any authority from the Third Circuit to the effect that compliance with firearms training absolutely bars any finding of a policy or custom of deliberate indifference to the need for training on SWAT Team tactics in barricade situations."). The plaintiffs have raised a fact issue as to whether HPD's training was adequate and whether the City was deliberately indifferent to inadequacies in the training, even though it met TCLEOSE standards.

The City also argues that the number of accidental discharges is small given the size of Houston and the HPD. Even considering this context, however, there are fact issues as to whether the evidence of similar incidents put the City on notice of inadequacies in training. The evidence shows that HPD's Police Chief receives the Noteworthy and internal affairs investigation of each incident. The relevant comparison is not with the number of times an HPD officer gets through a day without accidentally discharging his or her weapon at or in close proximity to other people, including those in physical encounters. Rather, the issue is whether the number and nature of incidents reveals a pattern showing deficient training that is "obvious and obviously likely to result in a constitutional violation." *Cousin v. Small*, 325 F.3d 627, 637 (5th Cir. 2003) (citations and quotations omitted). The evidence of twenty-six similar incidents of accidental discharges in five years, coupled with the various inquiries, memos, and letters about HPD's weapons and use-of-force training, the

inconsistent evidence as to what training HPD in fact provided on indexing and related techniques, and the obviousness of the risk created if officers are not trained on indexing, raises fact issues that preclude summary judgment.[9]   The fact issues include whether the City's policymakers were deliberately indifferent to the rights of its citizens.  Chief Bradford was  responsible for approving HPD's training program and received notice from several concerned sources—within HPD and from the community—before Escobar's death about the department's use-of-force training.  The pattern evidence of similar gun discharges in close-quarter struggles between officers and citizens gives rise to a fact issue as to whether HPD's handgun training was "obviously likely to result in a constitutional violation." *Thompson v. Upshur County*, 245 F.3d 447, 459 (5th Cir. 2001).  The summary judgment motion is denied as to the plaintiffs' claim for municipal liability based on a failure to train.

---

[9] *See, e.g., Zuchel v. City and County of Denver*, 997 F.2d 730 (10th Cir. 1993) (the plaintiffs sued after their son was shot by a police officer, arguing that the City's weapons training program was deficient; the plaintiffs' expert "supported his opinion that the training program was inadequate with specific deficiencies supported by the record," and the plaintiffs submitted evidence that before the district attorney had sent a letter to the police chief discussing recurring incidents of deadly force by police officers.  The letter made numerous suggestions for improving training in this area, but the police department made no effort to improve its training practices.); *Jacobs v. City of Shreveport*, No. 04–2492, 2006 WL 3247095 (W.D. La. Nov. 8, 2006) (the plaintiffs sought damages under section 1983 for the shooting death of their relative by a police officer that had occurred during a struggle after the deceased had fled a traffic stop; as part of an inadequate training claim, the plaintiffs described five similar incidents in which a "police officer shot an unarmed African-American who either led police on a car chase or refused verbal commands to stop"; although the claims were dismissed on other grounds, the court noted that the plaintiffs had identified "a purported pattern of similar incidents.").

### D.    The Texas Tort Claims Act

The plaintiffs allege that the City is liable under the Texas Tort Claims Act (TTCA), TEX. CIV. PRAC. & REM. CODE § 101.021 *et seq.*, for Officer Carbonneau's negligence in the shooting death of Eli Escobar.  A governmental entity cannot be held liable for the actions of its employees unless there is a constitutional or statutory provision waiving such immunity.  *See City of Amarillo v. Martin*, 971 S.W.2d 426, 427 (Tex. 1998); *Dallas County Mental Health & Mental Retardation v. Bossley*, 968 S.W.2d 339, 341 (Tex.), *cert. denied*, 525 U.S. 1017 (1998); *Harris County v. Dillard*, 883 S.W.2d 166, 168 (Tex. 1994); *Univ. of Tex. Med. Branch v. York*, 871 S.W.2d 175, 177 (Tex. 1994); *Lowe v. Tex. Tech Univ.*, 540 S.W.2d 297, 298 (Tex. 1976); *Harrison v. Tex. Bd. of Pardons & Paroles*, 895 S.W.2d 807, 809 (Tex. App.—Texarkana 1995, writ denied); *Bookman v. Bolt*, 881 S.W.2d 771, 774 (Tex. App.—Dallas 1994, writ denied).  A waiver requires clear and unambiguous language.  *See York*, 871 S.W.2d at 177; *Duhart v. State*, 610 S.W.2d 740, 742 (Tex. 1981).  In the absence of a waiver, the City is entitled to immunity from liability to the plaintiff.  *See York*, 871 S.W.2d at 177; *City of El Paso v. W.E.B. Invs.*, 950 S.W.2d 166, 169 (Tex. App.—El Paso 1997, writ denied); *Allen v. City of Midlothian*, 927 S.W.2d 316, 322 (Tex. App.—Waco 1996, no writ).

The Texas Legislature enacted the TTCA to waive sovereign immunity in limited circumstances.  *See Bossley*, 968 S.W.2d at 340, 343; *Kerrville State Hosp. v. Clark*, 923 S.W.2d 582, 586 (Tex. 1996); *York*, 871 S.W.2d at 177; *Harrison*, 895 S.W.2d at 809.  The TTCA provides:

A governmental unit in the state is liable for:

(1)     property damage, personal injury, and death proximately
        caused by the wrongful act or omission or the negligence
        of an employee acting within his scope of employment if:

        (A)     the property damage, personal injury, or
                death arises from the operation or use of a
                motor-driven vehicle or motor-driven
                equipment; and

        (B)     the employee would be personally liable to
                the claimant according to Texas law; and

(2)     personal injury and death so caused by the condition or
        use of tangible personal or real property if the
        governmental unit would, were it a private person, be
        liable to the claimant according to Texas law.

TEX. CIV. PRAC. & REM. CODE § 101.021.  Cities, as political subdivisions of the State of

Texas, come within the Act.  *See id.*, § 101.001(3)(B); *see also Vela v. City of McAllen*, 894

S.W.2d 836, 839 (Tex. App.—Corpus Christi 1995, no writ); *City of San Antonio v.*

*Winkenhower*, 875 S.W.2d 388, 392 (Tex. App.—San Antonio 1994, writ denied); *Wheeler*

*v. Yettie Kersting Mem'l Hosp.*, 866 S.W.2d 32, 45 (Tex. App.—Houston [1st Dist.] 1993,

no writ).  For a governmental entity to be held liable for the acts of its employee under the

TTCA, the claim must arise under one of three specific areas of liability and the claim must

not fall within an exception to the waiver of sovereign immunity.  *See Alvarado v. City of*

*Brownsville*, 865 S.W.2d 148, 155 (Tex. App.—Corpus Christi 1993), *rev'd on other*

*grounds*, 897 S.W.2d 750 (Tex. 1995); *accord City of Hempstead v. Kmiec*, 902 S.W.2d 118,

122 (Tex. App.—Houston [1st Dist.] 1995, no writ); *McKinney v. City of Gainesville*, 814

S.W.2d 862, 865 (Tex. App.—Fort Worth 1991, no writ); *see also City of Denton v. Page*,

701 S.W.2d 831, 834 (Tex. 1986); *Salcedo v. El Paso Hosp. Dist.*, 659 S.W.2d 30, 31 (Tex. 1983). "The determination of a governmental entity's negligence will be made only after a claimant has cleared these two statutory hurdles." *Alvarado*, 865 S.W.2d at 155.

To hold the City liable under the TTCA, Escobar's injuries must have been proximately caused by the operation or use of a motor-driven vehicle or motor-driven equipment or by a condition or use of tangible real or personal property. *See* TEX. CIV. PRAC. & REM. CODE § 101.021; *see also Bossley*, 968 S.W.2d at 342–43; *Salcedo*, 659 S.W.2d at 33; *Vincent v. West Tex. State Univ.*, 895 S.W.2d 469, 472 (Tex. App.—Amarillo 1995, no writ). Tangible property is property that is capable of being handled, touched, or seen. *See York*, 871 S.W.2d at 178; *Harrison*, 895 S.W.2d at 809; *Vincent*, 895 S.W.2d at 472; *Birdo v. Williams*, 859 S.W.2d 571, 573 (Tex. App.—Houston [1st Dist.] 1993, no writ); *Jefferson County v. Sterk*, 830 S.W.2d 260, 262 (Tex. App.—Beaumont 1992, writ denied). To state a claim under the TTCA based on the use or misuse of nondefective personal property, a plaintiff must allege (1) that the property was used or misused by a governmental employee acting within the scope of his or her employment, and (2) that the use or misuse of the property was a contributing factor to the injury. *See Smith v. Tarrant County*, 946 S.W.2d 496, 501 (Tex. App.—Fort Worth 1997, writ denied) (citing *Salcedo*, 659 S.W.2d at 32).

The negligence of the government employee must be the proximate cause of the injury and must involve a condition or use of tangible personal property under circumstances where there would be private liability. *See Salcedo*, 659 S.W.2d at 32; *Smith*, 946 S.W.2d at 501;

*see also York*, 871 S.W.2d at 178 n.5.  The property itself need not be the instrumentality of the alleged harm, but it must have been a contributing factor to the harm.  *See Salcedo*, 659 S.W.2d at 32; *Smith*, 946 S.W.2d at 501.  Causation requires more than mere involvement of property.  *See Bossley*, 968 S.W.2d at 343.  "Property does not cause injury if it does no more than furnish the condition that makes the injury possible."  *Id.* (citing *Union Pump Co. v. Allbritton*, 898 S.W.2d 773, 776 (Tex.1995)).

Under the TTCA, unlike section 1983, a governmental unit may be liable for its employee's negligence under the doctrine of respondeat superior.  *See DeWitt v. Harris County*, 904 S.W.2d 650, 653 (Tex. 1995).  "Respondeat superior imposes liability on the employer that is responsible for the acts of his employee, acting in the scope of his employment, where the negligence of the employee is shown to have been the proximate cause of [the] injury."  *Id.* at 654 (citing *Marange v. Marshall*, 402 S.W.2d 236, 239 (Tex. Civ. App.—Corpus Christi 1966, writ ref'd n.r.e.)).   Nevertheless, as with a private employer, affirmative defenses available to its employees are also available to the City.  *See id.*; *see also City of Columbus v. Barnstone*, 921 S.W.2d 268, 272 (Tex. App.—Houston [1st Dist.] 1995, no writ).  Liability cannot be imposed upon a governmental entity for the negligence of an employee who has official immunity.  *See DeWitt*, 904 S.W.2d at 653; *Tex. Dept. of Pub. Safety v. Perez*, 905 S.W.2d 695, 698, 700 (Tex. App.—Houston [14th Dist.] 1985, writ denied).  An employee may have official immunity even though he may have been negligent in the performance of his duties.  *See Guevara*, 911 S.W.2d at 904.

The plaintiffs assert that Escobar's death was caused by Carbonneau's negligent use of his service revolver. It is undisputed that a gun is tangible personal property. *See Smith*, 946 S.W.2d at 501. It is undisputed that Carbonneau's use of the gun caused Escobar's death. The issue is whether Carbonneau was negligent in pointing his weapon at Escobar while engaged in a hand-to-hand struggle and whether Carbonneau was acting within the scope of his employment.

The TTCA does not waive immunity for intentional torts. *See Taylor v. Gregg*, 36 F.3d 453, 457 (5th Cir. 1994); *Riggs v. City of Pearland*, 177 F.R.D. 395, 405 (S.D. Tex. 1997); *Huong v. City of Port Arthur*, 961 F. Supp. 1003, 1008–09 (E.D. Tex. 1997); *Kmiec*, 902 S.W.2d at 122; *City of San Antonio v. Dunn*, 796 S.W.2d 258, 261 (Tex. App.—San Antonio 1990, writ denied). The TTCA states:

> This chapter does not apply to a claim:
>
> (1)   based on an injury or death connected with any act or omission arising out of civil disobedience, riot, insurrection, or rebellion; or
>
> (2)   arising out of assault, battery, false imprisonment, or any other intentional tort, including a tort involving disciplinary action by school authorities.

Tex. Civ. Prac. & Rem. Code § 101.057. "This limitation provides that claims 'arising out of assault, battery, false imprisonment, or any other intentional tort' are not actionable" under the TTCA. *McCord v. Menil Med. Ctr. Hosp.*, 750 S.W.2d 362, 363 (Tex. App.—Corpus Christi 1998, no writ) (use of nightstick by security guard during intentional tort not

actionable); *see Riggs*, 177 F.R.D. at 405 (use of mace by police officer to subdue person engaging in bizarre behavior not actionable); *Callis v. Sellars*, 953 F. Supp. 793, 801 (S.D. Tex. 1996) (sexual abuse and harassment by police officer not actionable); *Dunn*, 796 S.W.2d at 261 (application of handcuffs too tightly during course of alleged false arrest not actionable).  "This provision shields municipalities from suits arising out of intentional torts committed by governmental employees and should be liberally construed to accomplish this objective."  *Gillum v. City of Kerrville*, 3 F.3d 117, 123 (5th Cir. 1993), *cert. denied*, 510 U.S. 1072 (1994) (citations omitted).

If the essence of a TTCA claim arises from an intentional tort, allegations of negligence are insufficient to avoid the section 101.057 exception to liability.  *See Callis*, 953 F. Supp. at 801; *Little v. Schafer*, 319 F. Supp. 190, 192 (S.D. Tex. 1970); *see also Dunn*, 796 S.W.2d at 261; *McCord*, 750 S.W.2d at 363.  "While it was pleaded in the complaint that the [defendant] negligently and without exercising reasonably prudent care shot and killed the deceased, the cause of action which [the plaintiff] sought to plead was one for wrongful assault and battery resulting in the death of the deceased."  *Alaniz v. United States*, 257 F.2d 108, 110–11 (10th Cir. 1958).

The City argues that Carbonneau's actions—both the placing of his hand on Escobar's shoulder and the shooting—constitute an intentional assault and are therefore outside the TTCA's waiver of immunity.  Carbonneau stated that he did not mean to discharge his weapon and that he recalls being bumped on his hand or arm just before the gun went off.  (Docket Entry No 95, Ex. 25 at 11).  At least one eyewitness supports this version of events.

88

(*Id.* at 5).  The plaintiffs' second amended complaint alleges that Carbonneau was negligent in using and discharging his firearm.  (Docket Entry No. 119 at 5).  The issues are whether Carbonneau intended to shoot Escobar and whether it was reasonably foreseeable that Escobar could be shot when Carbonneau drew his weapon and pointed it at Escobar's head during the struggle.  *See Reed Tool Co. v. Copelin*, 689 S.W.2d 404, 406 (Tex. 1985) (noting that the fundamental difference between a claim of negligence and an intentional tort is not whether the defendant intended the action, but whether he intended the resulting injury); *Bridges v. Robinson*, 20 S.W.3d 104, 114 (Tex. App.—Houston [14th Dist.] 2000, no pet.) ("[T]he fundamental difference between a negligence injury and an intentional injury is the specific intent to inflict injury."), *overruled on other grounds*, *Telthorster v. Tennell*, 92 S.W.3d 457, 464 (Tex. 2002); *Durbin v. City of Winnsboro*, 135 S.W.3d 317, 321 (Tex. App.—Texarkana 2004, pet. denied) (concluding that it is the intent to injure that distinguishes an intentional tort from a negligence cause of action); *see also Lopez-Rodriguez v. City of Levelland, Tex.*, 100 F. Appx. 272, 275 (5th Cir. 2004) (unpublished opinion) (vacating the district court's grant of summary judgment on the plaintiffs' TTCA claim based on an officer's accidental discharge of his weapon).  Given the record evidence, fact issues exist material to determining whether Carbonneau intended to shoot or kill Escobar.

The City argues that Carbonneau was acting outside the scope of his employment when he drew his service weapon, as evidenced by the internal affairs division's findings that Carbonneau violated HPD's use-of-force policy, G.O. 600-17, and HPD's sound-judgment

policy, G.O. 200-08.  (Docket Entry No. 82 at 20–21).  The City also argues that Officer Carbonneau's conviction for criminally negligent homicide shows that his actions were outside the course of his employment.

An official acts within the scope of his authority if he is discharging the duties generally assigned to him.  *City of Lancaster v. Chambers*, 883 S.W.2d 650, 658 (Tex. 1994).  The TTCA defines "scope of employment" as "the performance for a governmental unit of the duties of an employee's office or employment and includes being in or about the performance of a task lawfully assigned to an employee by competent authority."  TEX. CIV. PRAC. & REM. CODE § 101.001(5).  In general, whether a person is acting within the scope of his employment depends on whether the general act from which an injury arose was in furtherance of the employer's business and for the accomplishment of the objective for which the employee was employed.  *Leadon v. Kimbrough Bros. Lumber Co.*, 484 S.W.2d 567, 569 (Tex. 1972).  The inquiry here is "in what capacity was the officer acting at the time he committed the acts for which the complaint [was] made?"  *Blackwell v. Harris County*, 909 S.W.2d 135, 139 (Tex. App.—Houston [14th Dist.] 1995, writ denied).  For an employee's acts to be within the scope of his employment, "the conduct must be of the same general nature as that authorized or incidental to the conduct authorized."  *Minyard Food Stores, Inc. v. Goodman*, 80 S.W.3d 573, 577 (Tex. 2002) (quoting *Smith v. M Sys. Food Stores, Inc.*, 156 Tex. 484, 297 S.W.2d 112, 114 (1957)).  "In other words, if an employee deviates from the performance of his duties for his own purposes, the employer is not responsible for what occurs during that deviation."  *Id.* (citing *ITT Consumer Fin. Corp. v. Tovar*, 932 S.W.2d

147, 158 (Tex. App.—El Paso 1996, writ denied)); *Harris County v. Gibbons*, 150 S.W.3d 877, 882 (Tex. App.—Houston [14th Dist.] 2004, no pet.) ("[S]cope of employment is not determined simply on the basis of whether an officer is technically off-duty or on-duty. . . . Instead, when determining the status of an officer, we must ask 'in what capacity was the officer acting at the time he committed the acts for which the complaint was made?'").

The record evidence shows that Officer Carbonneau was acting in his role as an HPD officer when he and Officer Olivo responded to the call at the Silver Creek apartment complex.  The investigation into the reported assault included talking with three juveniles at the Burnham Woods apartment.  When Escobar tried to leave, Officer Carbonneau detained him for additional questioning.  During the course of this investigation, Carbonneau shot and killed Escobar.  The City's narrow reading of "scope of employment" would lead to the incongruous result that any time an employee violates a policy of his employer while performing his job, he steps outside the scope of his employment.

The City cites no authority to support its contention that Carbonneau's violation of G.O. 200-08 and G.O. 600-17 bring his actions outside the scope of his employment.  The cases that address the issue discuss whether off-duty officers act within the scope of their employment as peace officers, such as when officers act as security guards for private employers.  *See, e.g.*, *Morris v. State*, 523 S.W.2d 417, 418 (Tex. Crim. App. 1975); *Wood v. State*, 486 S.W.2d 771, 774 (Tex. Crim. App. 1972); *Gibbons*, 150 S.W.3d at 883–85; *Mansfield v. C.F. Bent Tree Apartment Ltd. P'ship*, 37 S.W.3d 145, 150 (Tex. App.—Austin

91

2001, no pet.); *Blackwell*, 909 S.W.2d at 139; *Bridges*, 20 S.W.3d at 111; *Firemen's & Policemen's Civil Serv. Comm'n v. Burnham*, 715 S.W.2d 809, 811 (Tex. App.—Austin 1986, writ denied).  The City's argument that Officer Carbonneau was acting outside the scope of his employment because he violated HPD policy is not persuasive.

The City also argues that Officer Carbonneau was acting outside the scope of his authority because a jury found him guilty of criminally negligent homicide.  The City cites *Harris County v. Going*, 896 S.W.2d 305 (Tex. App.—Houston [1st Dist.] 1995, writ denied), in support of this contention.  In *Going*, a county employee whose employment was terminated sued his supervisor, the county, and the county commissioner for unlawful discharge and retaliation.  *Id.* at 306–08.  The county argued that it was not responsible for the illegal acts of the supervisor.  The appellate court agreed, stating that "[w]hen a plaintiff sues over the violation of rights resulting from the unlawful acts of public servants, the plaintiff must bring the action against some individual in authority, not against the government unit itself."  *Id.* at 309.  *Going* was a wrongful termination suit, not brought under the TTCA.

Fact issues exist as to whether Carbonneau acted within the scope of his employment during Escobar's shooting, precluding the entry of summary judgment on the plaintiffs' TTCA claim.  The summary judgment motion as to that claim is denied.[10]

---

[10]  The plaintiffs do not assert a TTCA claim against Officer Carbonneau, nor could they maintain such an action once their claims against the City are resolved.  Under the TTCA, when an action against a governmental entity results in a judgment or is settled, an action against the employee whose act or omission gave rise to the claim is barred as a matter of law.  TEX. CIV. PRAC. & REM. CODE § 101.106.  This section bars the rendering of a judgment against an employee subsequent to or concurrent with a rendition of judgment as to the governmental employer.  *See Thomas v. Oldham*, 895 S.W.2d 352, 355 (Tex. 1995).  It

## VI.     Conclusion

The City's summary judgment motion is granted as to the plaintiffs' municipal liability theory based on a policy of unreasonable seizure and detention and denied as to the plaintiffs' theory based on inadequate weapons training and the plaintiffs' claim under the Texas Tort Claims Act.  Carbonneau's motion for a separate trial is denied.  The City's motion to exclude the plaintiffs' expert, David Klinger, is denied in part and granted in part. The City's motion to exclude the plaintiffs' expert, Stewart Ater, is denied as moot.  The plaintiffs' unopposed motion to supplement the summary judgment record is granted; the plaintiffs' motion for a hearing on the summary judgment motion is denied.

Docket call is set for **November 28, 2007, at 10:00 a.m.** on the remaining claims. The parties must file exhibit lists and witness lists, and exchange exhibits, no later than **October 26, 2007**.

SIGNED on September 29, 2007, at Houston, Texas.

_____

Lee H. Rosenthal
United States District Judge

---

applies "if the settlement or judgment in the action against the governmental unit occurs at any time before or during the pendency of the action against the employee."  *Id.*

93